**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| THE NEW GEORGIA PROJECT, BLACK VOTERS MATTER FUND, and RISE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; REBECCA SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; DAVID WORLEY, in his official capacity as a member of the Georgia State Election Board; MATTHEW MASHBURN, in his official capacity as a member of the Georgia State Election Board; and ANH LE, in her official capacity as a member of the Georgia State Election Board, <br><br> Defendants. | Civil Action No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs THE NEW GEORGIA PROJECT, BLACK VOTERS MATTER FUND, and RISE, INC., file this Complaint for Declaratory and Injunctive Relief against Defendants BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State (the "Secretary"); REBECCA SULLIVAN, in her official capacity as the Vice Chair of the Georgia State Election Board; DAVID WORLEY,

1

MATTHEW MASHBURN, and ANH LE, each in their official capacity as a member of the Georgia State Election Board, and allege as follows:

## NATURE OF THE CASE

1.     Over the past year, Georgia voters turned out in record-shattering numbers. In the 2020 general election, nearly 5 million Georgians voted, compared to 4.16 million in the 2016 general election. In the January 2021 runoff elections for both of Georgia's U.S. Senate seats, nearly 4.5 million voters cast ballots. The sky-high turnout in the runoff election bucked past trends, when voter participation typically dropped from the general election.

2.     After the high-turnout general election, officials conducted multiple recounts and audits. Supporters of former President Donald J. Trump filed several lawsuits seeking to overturn the general election's results, falsely alleging widespread fraud and misconduct on the part of elections officials. No court in any of these lawsuits found support for these litigants' fanciful claims. After the senatorial runoff elections, Secretary Raffensperger declared in a nationally televised interview that Georgia "had safe, secure, honest elections."

3.      Despite nationwide scrutiny of Georgia's elections, which only confirmed the absence of any fraud, insecurity, or wrongdoing, Republican members of the General Assembly voted to pass sweeping omnibus legislation (SB 202 or the

"Voter Suppression Bill") that is clearly intended to and will have the effect of making it harder for lawful Georgia voters to participate in the State's elections. And it will impose these unjustifiable burdens disproportionately on the State's minority, young, poor, and disabled citizens. Among its provisions, the Voter Suppression Bill:

- Imposes unnecessary and burdensome new identification requirements for absentee voting;

- Unduly restricts the use of absentee drop boxes;

- Bans mobile polling places;

- Prohibits the state from distributing unsolicited absentee ballot applications;

- Prohibits third-parties—including voter engagement organizations— from collecting absentee ballot applications;

- Burdens voters with the risk of disenfranchisement due to meritless challenges that require an immediate defense of their qualifications;

- Invalidates ballots cast by lawful voters before 5:00 p.m. in a precinct other than the one to which they were assigned, regardless of the reason or their ability to travel to another location (or wait until after 5:00 p.m.) to cast their ballot;

3

■ Bans any non-poll worker from giving food or drink, including water, to voters waiting in line;

■ Compresses the time period for voting in the runoff election.

4. These provisions lack any justification for their burdensome and discriminatory effects on voting. Instead, they represent a hodgepodge of unnecessary restrictions that target almost every aspect of the voting process but serve no legitimate purpose or compelling state interest other than to make absentee, early, and election-day voting more difficult—especially for minority voters.

5. Sponsors and supporters of the Bill insist that one of its primary purposes is to restore voters' confidence in Georgia's election administration, but these provisions do no such thing. Many of the restrictions the Bill imposes on Georgia voters—for instance, the absolute prohibition on handing out *any* food or drink to voters waiting in line at a polling place—will not instill voter confidence. And to the extent there are concerns about voters' "confidence" in Georgia's elections, they are the result of a cynical and thoroughly rebuked misinformation campaign—not based in reality. As Secretary Raffensperger acknowledged in January, Georgia experienced "safe, secure, honest elections." He even characterized many proposed laws from which the Bill originates as "reactionary to a three[-]month disinformation campaign that could have been prevented," referring

to the period after November 2, 2020, during which former President Trump and his supporters attempted to disrupt the democratic process by baselessly casting doubt on the results of Georgia's elections.

6.      The Bill's supporters also claim that it will "ensure" election integrity. But legislators and the Secretary himself have admitted that Georgia's elections are *already* safe and secure. The Secretary has described the state's election administration system as the "gold standard" for the United States. At no point during the 2020 election cycle did any elections official, any lawsuit, or any voter reveal anything in Georgia's election administration requiring any of the measures in the Voter Suppression Bill to "ensure" election integrity. Notably, this was not for want of trying.

7.      None of the Bill's burdensome and discriminatory changes to Georgia's election code will increase the public's confidence in the state's election administration or ensure election integrity. Rather, the grab bag of voting restrictions that populate SB 202 make clear that the Bill was animated by an impermissible goal of restricting voting. Taken together, these unjustified measures will individually and cumulatively operate to impose unconstitutional burdens on the right to vote, to deny or abridge the voting rights of Black Georgians, and to deny Black voters in

Georgia an equal opportunity to participate in the electoral process and elect candidates of their choice in violation of Section 2 of the Voting Rights Act.

## JURISDICTION AND VENUE

8.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

9.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

10.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

11.     Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(2) and under Local Civ. R. 3.1 because, *inter alia*, several defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district. Plaintiffs The New Georgia Project, Black Voters Matter Fund, and Rise, Inc. all operate within this district and division.

12.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

13.     Plaintiff THE NEW GEORGIA PROJECT ("NGP") is a nonpartisan, community-based nonprofit organization based in Fulton County, Georgia. NGP is dedicated to registering eligible Georgians statewide to vote and to helping them become more civically engaged. NGP also engages in voter education and registration activities in communities across the state to reach voters and help them to register, and eventually, to vote.

14.     NGP's mission is to register all eligible, unregistered citizens of color in Georgia. As of March 2021, NGP has registered more than 500,000 Georgians in all 159 counties in the state.

15.     The majority of voters registered by NGP are people of color, young voters, first-time voters (due to age or being newly naturalized citizens), and/or members of other underrepresented and vulnerable populations, including Georgians with disabilities and the elderly. NGP considers these half a million individuals it has registered to be a core part of its constituency.

16.     NGP has members and constituents across Georgia, whose right to vote will be burdened or denied as a result of the Voter Suppression Bill. NGP will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of the Voter Suppression Bill, which also threatens to undermine

its mission. NGP brings these claims on its own behalf, as well as on behalf of its member voters and constituents.

17. Plaintiff BLACK VOTERS MATTER FUND ("Black Voters Matter") is a nonpartisan civic organization whose goal is to increase power in communities of color. Effective voting allows a community to determine its own destiny, but communities of color often face barriers to voting that other communities do not. Black Voters Matter focuses on removing those barriers. It does so by increasing voter registration and turnout, as well as by advocating for policies to expand voting rights and access. Black Voters Matter is active statewide, particularly in communities that tend to have less access to national, state, and local resources and that have low-income and working-class populations. As a result of the Voter Suppression Bill, which threatens to undermine the organization's mission, Black Voters Matter must divert scarce resources away from its traditional voter education and turnout programs toward efforts to ensure that voters, and communities of color in particular, can navigate the restrictions to their voting options imposed by the Voter Suppression Bill.

18. Plaintiff RISE, INC. ("Rise") is a student-led 501(c)(4) nonprofit organization that runs statewide advocacy and voter mobilization programs in Georgia, as well as on a number of campuses nationwide. Rise's mission is to fight

for free higher education and to increase voting access for college students. To further its goal of expanding students' access to the franchise in Georgia, Rise operates volunteer networks across the State. Rise's student organizers and volunteers engage in grassroots voter registration, education, and turnout activities, including on-campus get-out-the-vote drives and canvasses.

19.     The Voter Suppression Bill directly harms Rise by making it more difficult for Georgia students who have joined the Rise movement to vote. The Voter Suppression Bill also frustrates Rise's mission and forces the organization to divert resources, as well as shift the focus of its day-to-day activities. Specifically, Rise and its student organizers will be forced to divert resources and day-to-day attention from their free college advocacy programs in Georgia and elsewhere to implement effective voter education and mobilization efforts.

20.     Defendant BRAD RAFFENSPERGER is the Secretary of State of Georgia, the State's chief elections official, O.C.G.A. § 21-2-210, and is named as a Defendant in his official capacity. In his official capacity, he is responsible for the administration and implementation of election laws in Georgia, including the Statute. *See id.*; *see also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("[I]it is clear that under both the Constitution and the laws of the State the Secretary is the

state official with the power, duty, and authority to manage the state's electoral system. . . .").

21.     Defendant REBECCA SULLIVAN is the Vice Chair of the Georgia State Elections Board (the "SEB") and is named as a Defendant in her official capacity. As a member of the SEB, she is responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1). The SEB is specifically responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent." *Id.* at (2). The Vice Chair, personally and through the conduct of her employees, officers, agents, and servants, acted under color of state law at all times relevant to this action.

22.     Defendants DAVID WORLEY, MATTHEW MASHBURN, and ANH LE are each members of the SEB and are named as Defendants in their official capacities ("SEB Member Defendants"). As SEB members, they are responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and

proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." *Id*. at (1). The SEB is responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent." *Id.* at (2). The SEB Member Defendants, personally and through the conduct of their employees, officers, agents, and servants, acted under color of state law at all times relevant to this action.

## STATEMENT OF FACTS AND LAW

### The 2020 Election in Georgia

23.     After Black voters narrowly failed to elect their candidate of choice in Georgia's 2018 gubernatorial election, efforts to mobilize Black voters for the 2020 election cycle redoubled. Organizations such as Plaintiffs NGP, Black Voters Matter, and Rise launched to register new voters—with an emphasis on voters of color and young voters—and to ensure these individuals would have their voices heard in the 2020 elections.

11

24.     The results were historic. Even as the COVID-19 pandemic raged, Georgia voters participated in the democratic process at record rates, relying on unprecedented enthusiasm for absentee voting.

25.     In the June 2020 primary election, nearly 1.1 million absentee ballots were returned for counting.

26.     In the November 2020 general election, more than 1.3 million absentee ballots were returned and accepted.  Nearly 30% of Black voters cast their ballot by mail in 2020, compared to only 24% of white voters.

27.     To ensure their absentee ballots were received by election officials, and to avoid mail-delivery errors or delays, voters relied heavily on drop boxes—secure receptacles on government property under 24/7 video surveillance where absentee ballots could be submitted.

28.     In Fulton County, for example, which is majority nonwhite, more than half of the 146,000 absentee ballots cast in the November election were submitted in a drop box.

29.     To accommodate historically high voter turnout, Fulton County also offered mobile voting units. These specially outfitted buses held eight to ten voting stations and were deployed across the county to make the voting process easy and efficient.

30.    In addition to absentee voting, approximately 2.7 million Georgians voted early in person in the 2020 general election; more than 2 million voters cast early in-person ballots in the U.S. Senate runoff elections.

31.    The high turnout of in-person voters resulted in long lines at many polling places—especially at polling places located in Black neighborhoods. While majority-Black neighborhoods comprise only one-third of Georgia's polling places, they account for two-thirds of the polling places that had to stay open late for the June primary to accommodate long lines. A recent study found that the average wait time in Georgia after polls were scheduled to close was six minutes in neighborhoods that were at least 90% white, and 51 minutes in places that were at least 90% nonwhite.

32.    To ease the burden of these wait times, organizers delivered free food and water to polling places with long lines, and counties offered extended early voting hours, outdoor drop boxes, and mobile voting units to give voters additional opportunities to cast a ballot.

33.    This successful mobilization was widely heralded as crucial in facilitating Black voter turnout and determining electoral outcomes. The presidential candidate preferred by Black voters won Georgia's electoral votes for the first time since 1992, and for only the second time since Georgia-native Jimmy Carter was on

the ballot in 1980. Black voters also successfully elected their candidates of choice in runoff elections for both of Georgia's U.S. Senate seats, including Reverend Raphael Warnock, who became the first Black person ever to represent Georgia in the Senate.

34.     In response, the paramount concern among leaders of the Republican Party was to prevent these results from repeating in future elections. As Alice O'Lenick, Chairwoman of the Gwinnett County Board of Registrations and Elections, explained to fellow Republicans, 2020 was a "terrible elections cycle" for the Republican Party. She said, "I'm like a dog with a bone. I will not let them end this session without changing some of these laws. They don't have to change all of them, but they've got to change the major parts so that we at least have a shot at winning."

35.     To justify the proposed voting restrictions, Republican Party leaders resorted to the exhaustively refuted canard of voter fraud. The same debunked falsehoods had been weaponized by Republican politicians across the country, including most visibly by former President Trump himself, in his and his allies' unsuccessful attempts to overturn his election loss. These efforts were repeatedly fueled by trumpeting unfounded accusations about illegal voting in heavily Black cities such as Philadelphia, Detroit, Milwaukee, and Atlanta.

36.     These efforts took on a special intensity in Georgia, where at least six different lawsuits challenged the legitimacy of, first, Georgia's November general election, and then the January runoff elections. Not a single one of those cases, however, was able to withstand even the slightest scrutiny. State and federal courts determined that the factual allegations of these lawsuits were unsubstantiated, and the legal contentions lacked merit.

37.     Meanwhile, Republican Secretary of State Brad Raffensperger explained in a letter to Congress that he had independently authenticated the legitimacy of Georgia's 2020 election.  He reported:

> [M]y office has taken multiple steps to confirm that the result is accurate, including conducting a hand audit that confirmed the results of the Presidential contest, a recount requested by President Trump that also confirmed the result; an audit of voting machines that confirmed the software on the machine was accurate and not tampered with, and an audit of absentee ballot signatures in Cobb County that confirmed that process was done correctly. Law enforcement officers with my office and the Georgia Bureau of Investigation have been diligently investigating all claims of fraud or irregularities and continue to investigate. **Their work has shown me that there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia.** … While there is no such thing as a perfect election, our law enforcement officers are not seeing anything out of the ordinary scope of regular post-election issues that will be addressed by the State Election Board after the investigations are complete. There will end up being a small amount of illegal votes (there always is in any election because federal and state law err on the side of letting people vote and punishing them after the fact), but nowhere near the amount that would put the result of the presidential election in question.

(Emphasis added).

38.    Secretary Raffensperger went on to include a "point by point refutation of false claims" related to voter fraud. He explained that the audit of Cobb County found "no fraudulent absentee ballots" with a 99% confidence threshold, and further confirmed that "the number of illegal voters in Georgia alleged by the President's allies are not accurate or reliable."

39.    These facts had no effect on Georgia lawmakers' nearly immediate calculated efforts to make voting more difficult in Georgia generally and for Georgia's Black voters in particular. Two days after Republicans lost the U.S. Senate runoff elections, Republican Georgia House Speaker David Ralston announced he would appoint a "Special Committee on Election Integrity."

40.    In a moment of candor, even Speaker Ralston recognized that the premise of the special committee—that the integrity of the 2020 election had somehow been compromised—was fiction. He said: "Let's look at the facts here. The facts are we've had [two] recounts. We've had an audit and we've had more than six—I've lost count. I know there's at least six lawsuits that have been filed, all of which have been dismissed. Which kind of begs the question if there were, in fact, significant wrongdoing would it not have been disclosed?" But the absence of significant fraud was irrelevant to the committee's creation and its subsequent efforts

to make voting unjustifiably more difficult for lawful Georgia voters, particularly Black voters.

## The Challenged Laws

41.    In the wake of general and runoff elections that saw Black-preferred candidates prevail in the presidential and U.S. Senate races for the first time in decades, Republican majorities in the Georgia General Assembly passed several restrictions on voting rights.

42.    *First*, the General Assembly enacted a requirement that voters requesting an absentee ballot submit with their application their driver's license number, their personal identification number on a state-issued personal identification card, or a photocopy of other specified forms of identification. This provision will disproportionately affect voters who are elderly, indigent, or from minority communities. According to one national study, as many as 25% of Black voters do not possess a current and valid form of government issued photo ID, compared to 11% of voters of all races.

43.    *Second*, the General Assembly effectively prohibited the use of portable or mobile polling facilities, which are now permitted only in emergencies the Governor declares and only to supplement the capacity of the polling place where the emergency circumstance occurred. This prohibition will harm voters especially

in minority communities. Fulton County, for instance, which is more than 44% Black, deployed mobile voting units, each with eight to ten voting stations, which will no longer be permitted as a method of voting under the Voter Suppression Bill.

44.     *Third*, the General Assembly prohibited counties from allowing voters to submit absentee ballots in drop boxes that are outdoors or available outside of regular business hours. Because Black adults are more likely to work multiple jobs as compared to workers of other races, eliminating before- and after-hours voting opportunities will disproportionately burden their electoral participation.

45.     *Fourth*, the General Assembly prohibited the State from distributing unsolicited absentee ballot applications to voters, as it did before the 2020 primary elections due to the COVID-19 pandemic. This restricts access to absentee voting, which Black voters used at disproportionately high rates in 2020.

46.     *Fifth*, the General Assembly restricted organizations that engage in voter mobilization efforts from sending absentee ballot applications to voters who may desire not to cast their ballot in person, and from returning an elector's completed absentee ballot application. These restrictions again harm Black voters disproportionately, as many of the most active grassroots organizations that mobilize Georgia voters are, like Plaintiffs, focused on Black communities.

47.     *Sixth*, the General Assembly prohibited any person from offering food or drink to voters waiting in line at a polling place. This prohibition will directly impact voters who are forced to wait in long lines at polling places. Polling locations in predominantly Black neighborhoods are more likely to experience congestion and lengthy wait times. This blanket prohibition on people offering food or drink to voters advances no plausible election administration goal, exacerbates the burden of waiting in long lines, and disproportionately impacts Black and other minority voters.

48.     *Seventh*, the General Assembly prohibited any provisional ballot to be counted that was cast before 5:00 p.m. in the wrong precinct. This change is especially likely to disenfranchise Black voters, who are more likely than white voters to have moved within their county, and thus more likely to vote at a local precinct different from the one assigned when they first registered to vote.

49.     *Eighth*, the General Assembly provided that Georgians may file an unlimited number of challenges against the registration and voting rights of fellow citizens, and local boards of registrars are now required to notify voters of any challenge lodged against them and hold a hearing on the matter in the immediate weeks after the challenge is filed. Lawful voters targeted by indiscriminate challenges will now be forced to quickly arrange to defend their qualifications before

a government board or risk disenfranchisement and removal from the registration rolls.

50.    *Ninth*, the General Assembly drastically compressed the timeframe for runoff elections and cut the mandatory early voting period for runoff elections from three weeks to five days. The change eliminates the guarantee of early voting on weekends, which racial minorities disproportionately rely on to cast their ballots.

51.    Collectively, these challenged provisions not only impose severe and unconstitutional restrictions on the voting rights of all Georgians, but they also disparately impact Black voters and effectively deny them an equal opportunity to participate in the electoral process and elect candidates of their choice.

## Racial Discrimination and Voting in Georgia

52.    The Voter Suppression Bill is hardly Georgia's first racially discriminatory voting practice. Georgia has a long and egregious history of implementing election laws that hinder Black and minority citizens' ability to participate equally in the political process.

53.    This history began shortly after the abolition of slavery, when Black men in Georgia first gained the right to vote and cast ballots in April 1868. After that election, the Georgia General Assembly passed a resolution that expelled 25 Black representatives and three Black senators. The General Assembly's resolution was

based on the belief that the right of Black men to vote did not give them the right to hold office, and Black legislators were thus deemed ineligible to serve under Georgia's post-Civil War state constitution.

54.     In 1871, Georgia became the first state to enact a poll tax. At the 1877 state constitutional convention, the General Assembly voted to make the poll tax permanent and cumulative, requiring citizens to pay all back taxes before being permitted to vote. As a result, Black turnout in Georgia's next elections plummeted. The poll tax was not abolished until 1945, after it had been in effect for nearly 75 years.

55.     Other means of disenfranchising Georgia's Black voters followed: literacy tests, strict residency requirements, onerous registration procedures, voter challenges and purges, the deliberate slowing down of voting by election officials so that Black voters would be left waiting in line when the polls closed, the adoption of "white primaries," and the use of discriminatory redistricting processes.

56.     After the poll tax was repealed in 1945, voter registration among Black men and women significantly increased. As a result of these purposeful voter suppression tactics, however, not a single Black citizen served in the Georgia General Assembly between 1908 and 1962.

57.     As late as 1962, 17 municipalities and 48 counties in Georgia required segregated polling places. When the U.S. Department of Justice filed suit to end the practice, a local Bibb County leader declared that the federal government was ruining "every vestige of the local government."

58.     To date, no Black man or woman has been elected governor of Georgia and just one, Senator Raphael Warnock, has been elected to the U.S. Senate—in the same election that immediately preceded (and spurred) the passage of the Voter Suppression Bill.

59.     Because of its history of discrimination against racial minorities, Georgia became a "covered jurisdiction" under Section 5 of the Voting Rights Act when Congress passed the landmark civil rights law in 1965, meaning any changes to Georgia's election practices or procedures were prohibited until either the U.S. Department of Justice or a federal court determined that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10304. Accordingly, between 1965 and 2013, after which the Supreme Court effectively barred enforcement of the Section 5 preclearance requirement, the federal government's independent oversight helped guard Georgia's minority voters against disenfranchisement and arbitrary and disparate treatment by the State in its election practices and procedures. While

Section 5 was in effect, Georgia received more than 170 preclearance objection letters from the U.S. Department of Justice under Section 5 of the Voting Rights Act.

60.    Georgia's history of racially discriminatory voting practices is so extensive and well-established, courts have effectively taken judicial notice of it. *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (*quoting Brooks*, 848 F. Supp. at 1560).

61.    Discrimination in the not-so-distant past can have reverberating effects. "[P]ast discrimination can severely impair the present-day ability of minorities to

participate on an equal footing in the political process. Past discrimination may cause blacks to register or voter in lower numbers than whites." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984).

62.     In addition to Georgia's history of discrimination against minorities in voting and elections, political campaigns in Georgia have often relied on both explicit and implicit racial appeals.

63.     In the 2014 Democratic House of Representatives primary election in House District 105, an unidentified Republican firm reportedly conducted a racially divisive robocall among likely Democratic voters in House District 105, asking if they would prefer to vote for "an Asian businessman or an African American swim mom." The poll was apparently referencing the two Democratic candidates in the primary race, Tim Hur, who is Asian-American, and Renita Hamilton, who is Black.

64.     A member of the board of commissioners in Gwinnett County, the second most populous county in the state, called the late Representative John Lewis a "racist pig" and suggested that his re-election to the United States House of Representatives is "illegitimate" because he represents a majority-minority district.

65.     In 2017, the Republican mayor of Georgia's seventh-largest municipality, Roswell, insinuated that voters in Georgia's Sixth Congressional District—which is majority white and has been represented by white Republicans

Newt Gingrich, Johnny Isakson, and Tom Price over the past three decades—would not vote for Democratic candidate (and now U.S. Senator) Jon Ossoff in the 2017 special election because he has an "ethnic-sounding" name. When describing voters in the Sixth District, the mayor said, "This is a mature voter base. If someone is going down the list, they're gonna vote for somebody who is familiar. . . If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim? Is he Lebanese? Is he Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."

66.    In the 2018 gubernatorial election, a white supremacist organization targeted Democratic candidate Stacey Abrams, who would have been Georgia's first Black governor, with robocalls laced with explicitly racist language.

67.    During the 2020 presidential and senatorial campaign, racist tactics and attacks accelerated. For example, then-Senator David Perdue mispronounced then-Senator Kamala Harris's name, saying "Ka-*ma*-la, *Ka*-ma-la, Kamala-mala-mala, I don't know, whatever." The Perdue campaign had previously depicted his opponent, now-Senator Jon Ossoff, who is Jewish, with a longer and thinner nose, playing into anti-Semitic stereotypes. Meanwhile, the National Republican Senatorial Committee ran ads on social media urging their voters to "stand your ground" next to a photo of

a white man sitting in the bed of a truck holding a gun, a reference to laws that have been used to justify the deaths of unarmed Black people.

68.     The ability of Georgia's Black citizens to participate in the political process has been further hindered by significant and disparate effects of discrimination in housing, education, employment, health, criminal justice, and other areas which persist to this day.

69.     For example, the Georgia Department of Community Health has reported that minorities in Georgia have worse health status and more chronic health conditions than whites. Between 2013 and 2017, the infant mortality rate for Black babies was twice that of white babies.

70.     In 2019, the unemployment rate for Black people in Georgia was 5.3%, compared to only 2.4% among white people, according to the Economic Policy Institute. Those inequities have gotten worse during the current recession as across the country as unemployment rates among Black workers decline at a slower rate than white workers. Unemployment rates spiked in May 2020—and Black workers' 16.8% unemployment rate was the highest of all racial groups.

71.     Homes in cities and neighborhoods in Georgia that have significant minority populations have lower values than homes located in predominantly white areas. Moreover, while real estate in Georgia has increased in value in those areas

with small Black populations, home values have decreased in all zip codes in the Atlanta metropolitan area where the population is at least 40% Black.

72. In education, the racial gap in graduation rates persist. In the 2019-2020 school year, 87% of white students graduated on time while just 81% of Black students did.

73. In 2017, more than half of Georgia's prison population was Black, even though Black People made up only approximately 32% of the population

74. The ongoing COVID-19 pandemic has only further highlighted the disparities between Black and white Georgians. A survey the Center for Disease Control and Prevention conducted of Georgia hospitals in March 2020 found that more than 80% of COVID-19 patients were Black. A study from the Morehouse School of Medicine found that a 1% increase of a county's Black population was associated with a 2.5% increase in the county's confirmed cases of COVID-19. Dougherty County, Georgia, which is 70% Black, had the most deaths from COVID-19—more deaths than even Georgia's largest county, Fulton County, which has more than *eleven times* Dougherty County's population.

75. These disparities, among others, are vestiges of Georgia's history of discrimination against its Black citizens, which continues to this day. The Voter Suppression Bill interacts with these social conditions to deny or abridge the voting

rights of Black Georgians, and to deny Black voters in Georgia an equal opportunity to participate in the electoral process and elect candidates of their choice. Protestors outside the Capitol recognized this, calling the Bill "Jim Crow 2.0." In fact, State Representative Park Cannon of Atlanta, a Black woman, was arrested by state troopers after knocking on Governor Kemp's office door to try to witness the bill signing.

## CLAIMS FOR RELIEF

## COUNT I

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Undue Burden on the Right to Vote**

76.   Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

77.   A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

78.   "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation."

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019).

79.    The Voter Suppression Bill inflicts severe burdens on Georgia's voters through each individual restriction and the cumulative effect of all the suppressive measures which impose barriers to voting absentee and in-person.

80.    Absentee voters will encounter an identification requirement that denies them the ability to vote absentee unless they possess certain limited forms of identification or identification numbers; restrictions on outdoor drop boxes that limit the availability of safe and secure methods of returning absentee ballots; and restrictions preventing election officials and organizations from even distributing absentee ballot *applications* or assisting voters in returning them.

81.    Georgians who vote in person are also targeted by the Voter Suppression Bill. It imposes a ban on mobile polling places, used by thousands of voters in recent high-turnout elections, limiting the accessibility to voting locations and requiring many voters to travel longer distances and wait in long lines. The Bill

also prohibits votes cast in the wrong precinct before 5:00 p.m. from being counted, which all but ensures that in-person voters whose inflexible schedules prevent them from voting after 5:00 p.m. face a significantly greater risk of outright disenfranchisement—the most severe burden on their voting rights.

82.     To make matters worse for in-person voters, the Voter Suppression Bill prohibits anyone from giving food or drink to those waiting in line, which serves no legitimate purpose other than to maximize the burdens of voting in person.

83.     For those who navigate these hurdles, the Voter Suppression Bill subjects them to unlimited voter challenges, the result of which imposes substantial burdens on voters who are forced to prove their eligibility and subjects voters to ongoing abuse.

84.     No state interest justifies any of these restrictions, which individually and cumulatively burden the right to vote. Before the General Assembly passed the Bill, the Secretary had referred to Georgia's election administration as the "gold standard" due to the state offering absentee voting, early voting, and election-day options. But now that that system facilitated record turnout in the 2020 general election and the 2021 U.S. Senate runoff elections, the General Assembly has acted to radically and unjustifiably punish the electorate, by dramatically curtailing it.

85.     Absentee voter fraud in Georgia—the justification for these restrictive measures—is virtually non-existent. According to the Arizona State University Cronkite School of Journalism, there have been only eight instances of voter fraud in Georgia since 2000 that resulted in a plea, consent order, or conviction—a negligible rate of fraud in absentee voting totaling 0.00003%.

86.     Rather than promote public confidence in Georgia's elections and ensure election integrity, the Voter Suppression Bill will make voting more difficult, result in disenfranchisement, and shatter voter confidence in Georgia's electoral process. In short, the challenged provisions of the Voter Suppression Bill are not supported by any state interest sufficient to justify the resulting restrictions on the voting process, and unduly burden the right to vote of all Georgia voters in violation of the First and Fourteenth Amendments.

## COUNT II

### Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301, *et seq.*

87.     Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

88.     Section 2 of the Voting Rights Act prohibits vote denial: the use of voting laws, policies, or practices, like absentee ballot procedures and qualifications, that deny, abridge, or otherwise limit Black voters' access or increase the burden for

Black people to exercise the right to vote. 52 U.S.C. § 10301. Discriminatory intent is not required to prove a Section 2 violation.

89.   "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

90.   Section 2 requires a "totality of the circumstances" analysis that includes factors such as:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Thornburg*, 478 U.S. at 44–45.

91.   As detailed above, there is a long history of voting-related discrimination against Black people in Georgia. Moreover, voting in Georgia is

highly polarized, and the shameful legacy of racial discrimination is visible today in Georgia's housing, economic, and health disparities.

92.     In large part because of the racial disparities in areas outside of voting—such as socioeconomic status, housing, and employment opportunities—the Voter Suppression Bill disproportionately impacts Black voters, and interacts with these vestiges of discrimination in Georgia to deny Black voters and equal opportunity to participate in the political process and/or elect a candidate of their choice.

93.     Under the totality of circumstances, the Voter Suppression Bill abridges and, in some cases, entirely denies the rights of Black voters who make up the core membership and constituency of Plaintiffs NGP, Black Voters Matter, and Rise.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

(a)     Declaring that the challenged provisions in the Voter Suppression Bill violate the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to vote;

(b)     Declaring that the challenged provisions in the Voter Suppression Bill violate Section 2 of the Voting Rights Act;

(c)     Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing any of the challenged provisions of the Voter Suppression Bill;

(d)     Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

(e)     Granting any such other and further relief as this Court deems just and proper.

Respectfully submitted, this 25th day of March, 2021.

<u>**Adam M. Sparks**</u>
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlwafirm.com
sparks@khlawfirm.com

Marc E. Elias*
Uzoma Nkwonta*
Jacob Shelly*
Zachary J. Newkirk*
Jyoti Jasrasaria*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
unkwonta@perkinscoie.com
jshelly@perkinscoie.com
znewkirk@perkinscoie.com
jjasrasaria@perkinscoie.com

*Counsel for Plaintiffs*
*\*Motions for Pro Hac Vice Forthcoming*