# EXHIBIT A

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

|  |  |
|---|---|
| JAMES J. BOUCHARD, | : |
| Movant, | : |
| v. | : Civil Action |
| MATSON MONEY, INC., | : File No. **2021CV345442** |
| Respondent. | : |

### PETITION TO COMPEL ARBITRATION

COMES NOW, Movant James J. Bouchard ("**Bouchard**"), through his undersigned counsel, pursuant to the Georgia Arbitration Code, O.C.G.A. § 9-9-6, and moves this Court for an order compelling arbitration of his claims against Respondent Matson Money, Inc. ("**Matson**") in the Atlanta, Georgia office of American Arbitration Association, Inc. ("**AAA**"), in accordance with the terms of an arbitration agreement between Bouchard and Matson, and shows the Court the following:

### PARTIES, JURISDICTION AND VENUE

1.

Bouchard is a resident of Fulton County, Georgia.

2.

Respondent Matson is an investment advisory firm headquartered in Ohio, and is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute. Service of process may be perfected by delivery of a copy of the Petition and Summons to Matson's registered agent, Taft Service Solutions Corp., 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202.

3.

This Court has personal jurisdiction over Matson pursuant to O.C.G.A. § 9-10-91(1) because Matson transacts business within this state; pursuant to O.C.G.A. § 9-10-91(2) because Matson committed tortious acts and omissions within this state; and pursuant to O.C.G.A. § 9-10-91(3) because Matson committed a tortious injury in this state caused by its acts and omissions outside of this state and it derives substantial revenue from services rendered in this state.

4.

Venue is proper in this Court pursuant to O.C.G.A. § 9-10-93 because the business at issue was transacted in Fulton County, and the tortious act, omission or injury occurred in Fulton County.

## FACTUAL ALLEGATIONS

### The Parties' Arbitration Agreement

5.

Respondent Matson is a national investment advisory firm with numerous clients in Georgia.

6.

On October 5, 2018, Movant Bouchard open four investment accounts with Matson through Matson's Co-Advisor Investus Advisers, LLC ("**Investus**") and Investus Representative Christopher Burns ("**Burns**"). Also, Bouchard later opened a fifth account with Matson.

7.

In connection with the opening of these accounts, Matson required Bouchard to sign Matson's standard form account opening documents, including identical Investment Management Agreements – each of which contains an arbitration provision, drafted by Matson, that requires

"*any controversy*" between Matson and Bouchard "*arising from or relating to this Agreement*" to be submitted to arbitration at AAA:

> ACCOUNT OWNER AGREES THAT ANY CONTROVERSY ARISING FROM OR RELATING TO THIS AGREEMENT … ARISING FROM OR RELATING TO ANY ACCOUNT OF OR TRANSACTION WITH OR FOR ACCOUNT OWNER, OR THE CONSTRUCTION, PERFORMANCE OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN ACCOUNT OWNER AND MATSON … WILL BE SUBMITTED TO AND SETTLED BY ARBITRATION IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE [AAA]. ANY ARBITRATION SHALL BE HELD IN THE COUNTY OF HAMILTON, STATE OF OHIO.

(Investment Management Agreement, pp. 32-33, attached as Exhibit 1) (Emphasis added).

### The Arbitration

#### 8.

In September 2020, Bouchard had a "controversy" that "ar[ose] from and relate[s] to" the Investment Management Agreement. Specifically, Matson negligently handled Bouchard's accounts. Accordingly, Bouchard filed an arbitration claim against Matson with AAA on November 11, 2020, in accordance with the arbitration agreement in Matson's Investment Management Agreement. (A copy of Bouchard's Statement of Claim is attached as Exhibit 2).

#### 9.

At about the same time, on October 28, 2020, Susan Zimmerman ("**Zimmerman**"), another client of Matson who opened an account with Matson through its Co-Advisor Investus and Burns, filed a lawsuit against Matson in the United States District Court for the Northern District of Georgia seeking class certification on behalf of other "similarly situated" clients of Matson and Co-Advisor Investus and Burns. Bouchard does not know Zimmerman and had no involvement whatsoever in the filing of her lawsuit.

10.

On November 12, 2020, AAA correctly determined that Bouchard's arbitration claim arose out of a consumer agreement and is therefore subject to the Consumer Arbitration Rules. (A copy of the case initiation letter from AAA is attached as Exhibit 3).

11.

Additionally, AAA determined that the venue provision in Matson's arbitration agreement that required the arbitration to be held in Ohio constituted a "substantial deviation" from the Consumer Rules, which require consumer arbitrations to be held in a "Reasonably Convenient Location". (*Id.*) Accordingly, pursuant to the Consumer Rules, AAA found that the arbitration must be held in its Atlanta, Georgia office, where Bouchard lives. (*Id.*)

12.

In response, on November 12, 2020, Matson objected to arbitration of Bouchard's claim (the "**Objection**"), arguing that Bouchard's claim "is not arbitrable *at this time*" because of Zimmerman's lawsuit. (A copy of the Objection is attached as Exhibit 4) (Emphasis added). According to Matson, Bouchard must wait to bring his claim in arbitration because he is a member of the putative class action filed by Zimmerman, and the arbitration agreement provides that:

> ... NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; OR WHO IS A MEMBER OF A PUTATIVE CLASS ACTION WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL (I) THE CLASS CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE ACCOUNT OWNER IS EXCLUDED FROM THE CLASS BY THE COURT.

(Emphasis in the original). Based on this language, Matson contends that Bouchard cannot bring his claims in arbitration until after the class is certified and he opts out of the class. (*Id.* p. 2).

4

13.

On November 13, 2020, Bouchard filed his Response in opposition to Matson's Objection (the "**Response**") (*see* Response, attached as Exhibit 5), arguing that:

(a)   Matson misrepresents the language of the arbitration provision.  Contrary to Matson's contention, the arbitration agreement does not provide that a putative class member cannot enforce the arbitration agreement.  Rather, it provides that the arbitration agreement cannot be enforced *against* a putative class member were he to initiate or join in a class action:

> … NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT **AGAINST** ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; OR WHO IS A MEMBER OF A PUTATIVE CLASS ACTION WHO HAS NOT OPTED OUT OF THE CLASS ….

(*Id.*)  In other words, Matson could not enforce the arbitration provision *against* Bouchard and force him to arbitrate if he chose to participate in a class action – but it does not take away or abridge Bouchard's contractual right to enforce the arbitration provision nor allow Matson to force Bouchard to participate in a class action if he chooses instead to arbitrate.  *Thus, Matson's argument is frivolous based on the plain language of the Agreement.*

(b)   There is also no legal justification for Matson's position.  Matson's misread of an arbitration provision that it drafted and included in its standard client agreements and required Bouchard to sign to open the accounts at issue serves one purpose: to force Bouchard to join a class action against his will.  Matson's scheme conflicts with the bedrock legal rule that a putative class member has a due process right to opt out of a class action.  *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985); *see also, Ticor Title Ins. Co. v. Brown,* 982 F. 2d 386 (9th Cir. 1992), cert denied 511 U.S. 117 (1994);  Fed. R. Civ. P. 23(b)(3).  Further, Matson's argument ignores traditional contract law principles.  Indeed, Matson wants to suspend Bouchard's right to

arbitration arising from a contract between Bouchard and Matson because Zimmerman (who Bouchard does not know, has never met, and is a stranger to Bouchard's agreement with Matson) filed a "putative" class action. But it is black-letter contract law that one party (e.g., Zimmerman) cannot waive another party's (e.g., Bouchard) contractual rights without that party's consent. *Thus, Matson's argument is also legally unsupportable.*

(c)     <u>Matson's Objection was filed in bad faith for the sole purpose of delay.</u>  Notably, Matson does not dispute the validity of the arbitration agreement (which it drafted and required Bouchard to sign), nor does it dispute that Bouchard's claims are covered by the arbitration agreement. Rather, Matson purposely distorts its own contract in order to claim that Bouchard cannot pursue his arbitration claim until after Zimmerman's class action is certified and Bouchard opts out, which could take months or even years. Matson's stalling tactic is particularly troubling because it depends on Matson's intentional mischaracterization of the plain language in its own contract. Bouchard did not file or participate in the putative class action, and he cannot be forced to wait to find out if a class is certified before he can pursue his own arbitration claim, especially where a valid, binding contract between Matson and Bouchard provides the right to bring his claims in arbitration under these circumstances.

14.

On December 1, 2020, AAA acknowledged receipt of Matson's Objection and advised the parties that "the issue of arbitrability can be raised to the arbitrator upon appointment." (A copy of the notice from AAA is attached as <u>Exhibit 6</u>). AAA's notice further stated that it would proceed with administration of the case upon receipt of Matson's payment of its portion of AAA's fees. (*Id.*)

15.

It is well-settled that where, as here, there is a broad arbitration clause, the question of arbitrability is itself subject to arbitration. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25, 1-3 S. Ct. 927, 74 L. Ed. 2d 765 (1983). *See also, Wise v. Tidal Construction Co., Inc.,* 261 Ga. App. 670, 672-673 (2003) citing *Collins & Aikman Products Co. v. Building Systems, Inc.,* 58 F. 3d 16, 20 (2d Cir. 1995)  (even the question of arbitrability is itself subject to arbitration). *Accord, Pickle v. Rayonier Forest Resources, L.P.,* 282 Ga. App. 295 (2006). Here, the arbitration provision is extremely broad, and therefore, as AAA correctly advised the parties, *the issue regarding arbitrability has to be submitted to the arbitrator.*

16.

However, instead of submitting the issue of arbitrability to the arbitrator, as required by law and by AAA directive, Matson obstructed the arbitration process by refusing to pay its portion of the AAA fees – and therefore, AAA was unable to proceed and had to close the file.  (A copy of AAA's closure notification is attached as Exhibit 7).

17.

Matson is an SEC Registered Investment Advisor (**"RIA"**) and as such, it is a "fiduciary" subject to the Investment Advisors Act of 1940 (the **"Act"**).   In addition, the Investment Management Agreement expressly provides that Matson was acting as Bouchard's "fiduciary".

## **MOTION TO COMPEL ARBITRATION**

18.

Bouchard filed an arbitration claim against Matson with AAA's Atlanta office in accordance with the terms of the arbitration provision in Matson's own Investment Management Agreement.

19.

Matson has refused to participate in and affirmatively obstructed arbitration; raised frivolous objections to arbitrability in bad faith for the sole purpose of delay; refused to submit the issue of arbitrability to the AAA arbitrator; and refused to pay its portion of the AAA forum fees, thereby unilaterally preventing AAA from administering the arbitration, in breach of the parties' arbitration agreement (which it drafted in its own client agreement and required Bouchard to sign).

20.

Matson has acted in bad faith, been stubbornly litigious, and caused Bouchard unnecessary time and expense, thereby entitling Bouchard to an award of fees and expenses, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Bouchard respectfully requests that this Court enter an order

(1)     compelling Matson to arbitrate Bouchard's claims in the Atlanta, Georgia office of AAA, in accordance with the terms of the arbitration provision in Matson's Investment Management Agreement;

(2)     awarding Bouchard all costs and expenses, including court costs and reasonable attorneys' fees, incurred in obtaining this Order; and

(3)     for such other and further relief as the Court deems just and proper.

This 4th day of February, 2021.                Respectfully submitted,

DOVIN | FICKEN LLC

Edward J. Dovin
Georgia Bar No. 227645
ejdovin@dovinficken.com

Allison S. H. Ficken
Georgia Bar No. 355875
ahficken@dovinficken.com

Monarch Plaza
3414 Peachtree Road, NE, Suite 625
Atlanta, Georgia 30326
(770) 829-3869 – telephone
(770) 829-3865 – facsimile

Attorneys for Movant

DocuSign Envelope ID: 9758F22C-5363-439D-9595-C0F634A09BC8

# Matson Money, Inc.
### Investment Management Agreement

The internal laws of the State of Ohio will govern this Agreement and its enforcement. Nothing herein will be construed in any manner inconsistent with the Advisers Act or any rule or order of the SEC or under ERISA, if applicable.

### 14.3 Right of Refusal, Headings, Severability, Counterparts; Survival

Matson Money reserves the right to refuse to accept or renew this Agreement in its sole discretion and for any reason. All Section headings in this Agreement are for convenience of reference only, do not form part of this Agreement, and will not affect in any way the meaning or interpretation of this Agreement. If any provision of this Agreement is or should become inconsistent with any present or future law, rule or regulation of any governmental or regulatory body having jurisdiction over the subject matter of this Agreement, such provision will be deemed to be rescinded or modified in accordance with any such law, rule or regulation. In all other respects, this Agreement will continue and remain in full force and effect. This Agreement may be executed in counterparts, each of which will be deemed an original and all of which together will be deemed to be one and the same Agreement. The provisions of Sections 7, 8, 9, 10, 11 and 14 of this Agreement will survive the termination of this Agreement.

### 14.4 Entire Agreement; No Implied Waiver

This document states the entire agreement between the parties when executed and accepted and can be amended only by a written document signed by all parties to this Agreement. No term or provision of this Agreement may be waived or modified unless the party against whom such waiver or modification is sought to be enforced consents. The failure of Matson Money or Co-Adviser to insist at any time on strict compliance with this Agreement or with any of the terms under this Agreement or any continued course of such conduct on their respective parts will in no event constitute or be considered a waiver by either of them of any of their respective rights or privileges. You agree that this Agreement, and all the terms in it, will be binding on your heirs, executors, administrators, personal representatives, and assigns.

### 14.5 Delivery of Written Communications

All written communication between Matson Money and the Co-Adviser pursuant to this Agreement will be delivered in accordance with the agreement between Matson Money and the Co-Adviser. All notices or other written communications required or permitted to be given to you under this Agreement by either Matson Money or your Co-Adviser will be sent by first class mail, overnight mail with tracking record, or certified mail, return receipt, requested to the address-of-record listed on your Account or such other addresses as you may designate in writing or otherwise. Such communications may also be sent electronically by confirmed facsimile or confirmed email if you instruct Matson Money and your Co-Adviser, through your Co-Adviser Representative, that you would prefer electronic forms of communication.

## 15. ARBITRATION

THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE. BY SIGNING AN ARBITRATION AGREEMENT, THE PARTIES AGREE AS FOLLOWS:

- ALL PARTIES TO THE AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

- ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.

- THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS, AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

- THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.

- THE PANEL OF ARBITRATORS MAY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

- THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.



DocuSign Envelope ID: 9758F22C-5363-439D-9595-C0F634A09BC6

# Matson Money, Inc.
## Investment Management Agreement

- THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED AND ANY AMENDMENTS THERETO SHALL BE INCORPORATED INTO THE AGREEMENT.

ACCOUNT OWNER AGREES THAT ANY CONTROVERSY ARISING FROM OR RELATING TO THIS AGREEMENT (INCLUDING ANY CONTROVERSY BETWEEN MATSON MONEY, THE CO-ADVISER OR YOUR CO-ADVISER REPRESENTATIVE AND ACCOUNT OWNER), ARISING FROM OR RELATING TO ANY ACCOUNT OF OR TRANSACTION WITH OR FOR ACCOUNT OWNER OR THE CONSTRUCTION, PERFORMANCE OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN ACCOUNT OWNER AND MATSON MONEY, WHETHER ENTERED INTO BEFORE OR AFTER THE DATE HEREOF, WILL BE SUBMITTED TO AND SETTLED BY ARBITRATION IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION. ANY ARBITRATION SHALL BE HELD IN THE COUNTY OF HAMILTON, STATE OF OHIO. HOWEVER, THIS PARAGRAPH DOES NOT CONSTITUTE A WAIVER OF ANY RIGHT PROVIDED BY THE ADVISERS ACT, INCLUDING THE RIGHT TO CHOOSE THE FORUM, WHETHER ARBITRATION OR ADJUDICATION IN WHICH TO SEEK DISPUTE RESOLUTION. THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, WILL BE FINAL, AND JUDGMENT ON ANY AWARD RENDERED BY THE ARBITRATORS MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.

NOTWITHSTANDING THE FOREGOING, NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; OR WHO IS A MEMBER OF A PUTATIVE CLASS ACTION WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL (I) THE CLASS CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE ACCOUNT OWNER IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

[INVESTMENT MANAGEMENT AGREEMENT CONTINUED ON NEXT PAGE]



BEFORE
THE AMERICAN ARBITRATION ASSOCIATION

James J. Bouchard,                          )
                                            )
        Claimant,                           )
v.                                          )
                                            )    Case No. _____
Matson Money, Inc.,                         )
                                            )
        Respondent.                         )

## STATEMENT OF CLAIM

Claimant James J. Bouchard ("**Mr. Bouchard**") hereby submits this Statement of Claim

and requests arbitration of his claims against Respondent Matson Money, Inc. ("**Matson**").

## SUMMARY OF CLAIM

Matson breached its contract with Mr. Bouchard, breached its fiduciary duty to him, and

negligently failed to safeguard his IRA account by not appropriately managing and monitoring

that account or discussing suspicious account withdrawals with him.  The consequences of

Matson's failures are devastating: Mr. Bouchard now faces a $325,000 net out-of-pocket loss

(nearly one-third of his hard-earned IRA over a forty-year career), plus substantial tax liability.

In June 2019, just months after Mr. Bouchard retired and opened a long-term IRA account

with Matson in October 2018, it recommended, through its co-advisor Investus Advisors, LLC

("**Investus**") and its CEO Christopher W. Burns ("**Burns**"), that he withdraw *over one-third* of

the account and loan it to Investus at eight percent (8%) interest as part of a "peer-to-peer" lending

program (i.e., loans to other Matson/Investus clients).  Shortly thereafter, Mr. Bouchard opened a



new Matson account that started receiving the monthly interest payments from the peer-to-peer loans. Though Matson knew that Mr. Bouchard prioritized "capital preservation," it said *nothing* to Mr. Bouchard about these rapid, material, and taxable decisions involving *two Matson accounts*.

From June 2019 to August 2020, all interest and required principal payments on the loans were made in a timely manner. However, when the September 2020 payment was not made, Mr. Bouchard learned that Burns had disappeared and was under investigation by the SEC. Mr. Bouchard immediately contacted his "Advisor" – Matson – which said it was reviewing its records. Now that Burns faces an arrest warrant for defrauding clients, Mr. Bouchard presumes his funds have been stolen.

Under Matson's Investment Management Agreement with Mr. Bouchard, Matson pledged to serve as Mr. Bouchard's "fiduciary" and "attorney-in-fact" with "discretionary authority" over his IRA account. Specifically, Matson promised to monitor all "withdrawals" from his IRA account so that it could "coordinate the activity in the account", and it agreed to be "responsible for frequent and open communication with [Mr. Bouchard] on all significant matters pertaining to investments including (1) major changes in investment strategy, and portfolio structure." In fact, Matson assured the SEC in its publicly filed Form ADV that it *"communicates directly with clients on unusual circumstances, such as following up on suspicious transactions to enhance security."* (*See*, Exhibit 1: Matson Money, Inc. Form ADV pp. 5-6) (emphasis added). Had Matson fulfilled *any* of these duties, Mr. Bouchard would have avoided the devastating loss of irreplaceable retirement savings earned over a long career. In fact, Matson should have known about Burns's fraud long before Mr. Bouchard opened his IRA account in late 2018 – *because the scheme began in 2017 and more than 50 other Matson clients had already been defrauded by that time.*

Thus, Matson clearly breached both its contractual and fiduciary duties to Mr. Bouchard and negligently failed to contact him about numerous red flags and instances of highly suspicious activity in his account.   Accordingly, Mr. Bouchard is entitled to recover all losses on his investments in the peer-to-peer lending program, including unnecessary tax consequences of the early withdrawals, plus interest, attorneys fees, and costs as specified in the Notes.

## FACTUAL BACKGROUND

### 1.   Matson, Investus, and Burns

Matson Money Inc. is an SEC Registered Investment Advisor ("RIA") headquartered in Mason, Ohio.   As such, it is a "fiduciary" subject to the Investment Advisors Act of 1940 (the "Act").   Matson manages clients' funds on a discretionary basis, and it presently has over $8 billion in investor assets under management.

Investus Advisers, LLC was also an SEC RIA, as of April 2017, headquartered in Atlanta, Georgia.   It is owned by Burns, its CEO.   Investus helps its customers open accounts managed by Matson and then serves as "Co-Advisor" on those accounts, with Matson acting as "Advisor."   Investus does not have discretion over such accounts, but Matson does.   Investus' primary function is to meet with customers, explain investment options, and help customers open Matson accounts.

Burns is an SEC RIA who was previously registered with the Financial Industry Regulatory Authority.   Burns began his career in the securities industry in 2011 with OneAmerica Securities. He is currently registered with Investus and advertises to the public under the "Dynamic Money" platform.   Burns frequently provided investment advice on major cable television outlets and had a weekly radio show on popular Atlanta-area radio station WSB 750 AM.   He is listed as the "Co-Advisor Representative" on all of the Matson Agreements with his clients.

### 2.    Mr. Bouchard

James Bouchard is a 64-year old who retired five months ago and lives in Alpharetta, Georgia, with Anne, his wife of 41 years. Mr. Bouchard graduated from West Point, served for six years as an Army officer, and then spent 35-years working for two corporations: Procter & Gamble (17 years) and Clorox (18 years). Mr. and Mrs. Bouchard have two adult children, and six grandchildren. Neither Mr. nor Mrs. Bouchard have any special training or education in investment matters, let alone retirement planning; that is why they hired Matson to serve as their "Advisor" on such issues.

### 3.    Initial Dealings with Burns and Investus

In April 2018, a family friend referred Mr. Bouchard to Burns for "retirement investment advice." At the time, Mr. Bouchard was considering retirement, but was unsure if he had sufficient funds to support a comfortable lifestyle without becoming a burden to his children. Mr. Bouchard set up a meeting with Burns to discuss these issues.

Mr. and Mrs. Bouchard met with Burns on four occasions between April and September of 2018 to discuss if and when Mr. Bouchard could retire from his position at Clorox, and any investment advisory services Burns could provide to achieve that goal. Investus charged Mr. Bouchard $1,000 for the consultations.

In their meetings, Burns appeared knowledgeable, savvy, and experienced. It was easy to see why he had been so successful as a TV and radio investment expert. He also came across as sincere and trustworthy when he talked about his wife, three children, and the well-known, local church he attended. He shared with Mr. and Mrs. Bouchard that he grew up going to the same church they had attended for more than ten years, and further disclosed that it was a major part of

why he became a Christian and decided to become a youth pastor. Burns's Christian faith was a key reason Mr. and Mrs. Bouchard found him trustworthy, particularly because their faith has been a major part of their lives since losing a child early in their marriage.

As much as Mr. and Mrs. Bouchard liked and trusted Mr. Burns, his discussion about his relationship with the management firm Matson Money sealed the deal. As discussed in the next section, Burns explained that Matson would *handle all their investments* if they hired Burns. He emphasized that Matson's track-record of successfully managing customers' most important accounts was rock solid.

Ultimately, Burns convinced Mr. Bouchard that he could comfortably afford to retire at age 64, although he would not start drawing Social Security until he reached age 66 in 2022.

### 4.    Dealings with Matson

After Mr. Bouchard decided to move forward with Burns, he looked to Burns to explain how his money would be managed by Matson in a safe and secure way. According to Burns, all Mr. Bouchard's retirement accounts would be transferred to a custodial firm such as E-Trade, and would then be managed (traded) solely by Matson. He explained that his role at Investus was to help Mr. Bouchard select his investment objectives, and thereafter, Matson would have "full control" over Mr. Bouchard's retirement accounts to properly invest and monitor the funds in accordance with Mr. Bouchard's conservative investment objectives.

Notably, Burns stressed that every investment decision involving Mr. Bouchard's retirement accounts would be made and monitored solely by Matson, and he touted Matson as one of the largest and most experienced money management firms in the world, having billions of dollars under management. Burns was especially proud of his association with Matson as

co-advisor on all his clients' accounts.  As a result, the Bouchards felt they could trust and rely on

Matson, and this allayed any concerns they might have had dealing solely with Investus and Burns.

On October 5, 2018, Burns helped Mr. Bouchard open four accounts with Matson: Account

#688343 ("**IRA**"), Account #688413 ("**Personal TOD**"), Account #688417 ("**Roth IRA**"), and

Account #690401 ("**Inherited IRA**").  The IRA account contained the bulk of the assets, over

$1 million.  In connection with the opening of these accounts, Mr. Bouchard signed identical

Investment Management Agreements with Matson, which provided, in pertinent part:

- Matson would serve as the Advisor over the accounts, with Investus acting as Co-Advisor and Burns acting as Co-Advisor Representative.

- Matson alone would have full "discretionary authority" over the accounts, acting as Mr. Bouchard's "attorney-in-fact."  Investus and Burns would not have discretion over the accounts.

- As Mr. Bouchard's "attorney-in-fact," Matson would have full authority to trade the accounts and *"make investment decisions and effect transactions ... without seeking approval"* from Mr. Bouchard.

- Matson would monitor all the activity in the accounts, *including all "withdrawals,"* so it could properly *"coordinate the activity in the Account."*

- Matson would be "responsible for frequent and open communication with [Mr. Bouchard] on all significant matters pertaining to investments including (1) major changes in investment strategy, and portfolio structure..."

- Matson acknowledged that "as to the performance of its duties under [the Agreement], it is a 'fiduciary.'"

(*See*, Exhibit 2: Investment Management Agreement (the "**Agreement**")).

Upon signing the Agreement and beginning the process of asset transfer to allow for

Matson's management, Mr. Bouchard received a welcome letter from CEO Mark Matson dated

October 5, 2018.  (*See*, Exhibit 3: Matson letter).  In the letter, Mr. Matson thanked the Bouchards

for "putting [their] trust in Matson Money and allowing us to *share in your investment experience*." (*Id.*) (emphasis added).

At the time Mr. Bouchard executed the Agreement(s) and received Mr. Matsons welcome letter, Mr. and Mrs. Bouchard again met with Burns to discuss Mr. Bouchard's investment objectives in greater detail. After review of Matson's defined list of "investment objectives," Mr. Bouchard identified "balanced growth" as his investment objective. Notably, "balanced growth" was described by Matson on its paperwork as "*capital preservation* with moderate growth…" (*See*, Exhibit 4: Account Owner Questionnaire, p. 7) (emphasis added). Burns explained to Mr. Bouchard that *Matson would follow that objective*.

Finally, custodial accounts were set up at E-Trade to hold Mr. Bouchard's retirement funds, allowing Matson to effect trades in the securities of its choosing. In the following months, Matson began purchasing securities in the accounts, largely its proprietary mutual funds, in keeping with Mr. Bouchard's stated investment objective of "capital preservation with moderate growth."

5.     **Peer Connect Investments**

On June 19, 2019, during a regularly scheduled meeting in Investus' offices, Burns presented Mr. and Mrs. Bouchard with a potential investment opportunity: a peer-to-peer lending program that he called the "Peer Connect Program" (the "**Program**"). According to Burns, the Program involved loaning money to other clients associated with worthy organizations in need of short-term financing. Most of these organizations were involved in very socially-conscious endeavors, such as medical providers who wanted to assist refugees in impoverished foreign countries. Burns said that many of his and Matson's clients had participated in this Program and

it was a fairly standardized investment that aligned with Mr. Bouchard's objective to preserve capital with moderate growth.

According to Burns, the mechanics of the Program were straightforward: Mr. Bouchard would sign a promissory note issued by Investus entitling Mr. Bouchard to eight percent (8%) interest on his investment.  Investus would then be responsible for sending the funds to the true client "borrower" and collecting the interest and principal payments.[1]  Burns added that he and Investus would stand behind the notes, but that the transaction would be done through Matson. Indeed, *a separate account would be set up at Matson specifically to hold the interest and principal payments* from Mr. Bouchard's investments in the Program.  Burns explained that the Matson account would be set up before any money changed hands or paperwork was signed.

Further, Burns emphasized that the Program was approved for IRA accounts, and assured Mr. Bouchard in writing that there would be no adverse tax consequences.  And given the 8% guaranteed return, Burns advised that it would be an ideal way for Mr. Bouchard to bridge the gap in his retirement income until he turned 66 and could start collecting Social Security.

The Program appealed to Mr. and Mrs. Bouchard, especially because of its social purpose and guaranteed income.  Moreover, the fact that everything would be handled through Matson – including setting up an account at Matson specifically for the investment – assured them of the credibility of the program.  It indicated to them that the entire investment "team" was participating in and approved of Mr. Bouchard's investment in the Program.

---

[1] The promissory note provided that collateral to secure the investment would be held at Schwab.

Accordingly, on June 24, 2019, Mr. Burns helped Mr. Bouchard open a new account (#715446) at Matson for the sole purpose of making an investment in the Program. The next day, June 25th, Mr. Bouchard authorized the withdrawal of $350,000 from his Matson-managed IRA at E-Trade for the purpose of investing in the Program. Those funds were deposited into his checking account by E-Trade, and he then wrote a check to his Co-Advisor, Investus. Mr. Bouchard then received a "Promissory Note - Peer Connect" (*i.e.*, the peer-to-peer lending program) for $350,000 – dated June 25, 2019 and signed by Burns as "owner" of Investus (the "**Note**"). Burns also signed and delivered a "Guarantee." The default paragraph in the Note states that any amounts owed "may be collected forthwith from the pledged collateral held in custody by Charles Schwab." The Note also provides for the guaranteed 8% interest, plus all costs and 20% attorneys fees should the Note be collected through an attorney.

Subsequently, all payments due under the Note from July through November 2019 were made in a timely manner and deposited in the Matson account specifically designated for this investment (and under Matson's management).

In November 2019, Burns notified Mr. Bouchard that he had another peer-to-peer lending opportunity that involved an environmentally-friendly waste management company that needed short-term funds. Burns requested $50,000, again from Mr. Bouchard's Matson-managed IRA, with repayment to be made in a lump sum on January 3, 2020 to Mr. Bouchard's Matson account created for the Program. Again believing that Burns, Investus, and Matson recommended and approved this investment, Mr. Bouchard agreed to it and entered a second note with another guarantee. Soon thereafter, $50,000 was withdrawn from Mr. Bouchard's Matson-managed IRA. Then in February 2020, when the $50,000 note was due, the $50,000 principal was deposited back into Mr. Bouchard's IRA account at Matson and the $3,000 interest payment was paid to

Mr. Bouchard directly. This, of course, reaffirmed the Bouchard's belief that this was a legitimate investment endorsed by Matson.

In March 2020, Burns contacted Mr. Bouchard and suggested that all future interest payments on the $350,000 Note be made directly to the Bouchards. Burns explained that the Covid pandemic might cause disturbances to the stock market and receiving the interest payments directly would provide the Bouchards with some peace-of-mind during this trying time. The Bouchards followed Burns' recommendation and appreciated that he was looking out for their best interests, like the team at Matson.

From June 2019 through August 2020, Mr. Bouchard received each monthly payment when due on the $350,000 Note. However, soon after seeing that the September 2020 payment had not been made, Mr. Bouchard learned in early October that Burns was missing. Mr. Bouchard's first reaction was to immediately call his "Advisor," Matson. On October 6, 2020, just days after hearing the alarming news about Burns's disappearance, Mr. Bouchard contacted Matson and spoke to Rick Wiehe, Matson's Vice President of Operations. Mr. Wiehe said that Matson was investigating the matter, and that Mr. Bouchard "would be assigned a new Co-Advisor." Mr. Wiehe also asked Mr. Bouchard to send him the Notes he had entered through the peer-to-peer lending program. Shortly thereafter, a new "Co-Advisor" called Mr. Bouchard and indicated that he had been assigned to Mr. Bouchard's Matson accounts. When Mr. Bouchard inquired about his IRA funds that had disappeared, the new co-advisor told him that he had just learned about it the day before and that Matson's "forensics team is looking into it." That was Mr. Bouchard's last communication with Matson.

At this point, it is Mr. Bouchard's understanding that Burns has gone missing from his wife, children, and family. His car was found abandoned with copies of cashiers checks totaling $78,000. Investus' offices are closed, no money has been located anywhere to satisfy promissory notes underlying the peer-to-peer lending program, and the federal authorities are pursuing criminal charges against Burns.

## LEGAL ANALYSIS

Based upon the foregoing facts, Mr. Bouchard's claims against Matson include, without limitation:

1. Breach of Contract

2. Breach of Fiduciary Duty

3. Negligence

## 1. Breach of Contract

Matson's Investment Management Agreements ("**Agreements**") with Mr. Bouchard expressly provide that Matson will invest his assets on a discretionary basis as his fiduciary, in accordance with his investment objectives. (Exhibit 2: Agreement, p. 24). Notably, the Agreements expressly provide that Mr. Bouchard's account will be invested in Matson's proprietary mutual funds (not in promissory notes). (*Id.*, p. 24-25). Moreover, the Agreements specifically provide that Matson will safeguard Mr. Bouchard's IRA assets, and will monitor and be aware of all "withdrawals" so that it can "coordinate the activity in the account". (*Id.*, p. 26). Likewise, Matson's Form ADV filed with the SEC also states that it will notify its clients of any "suspicious" transactions so as to ensure the "security" of the accounts it manages.

Matson breached the Agreements (and its representations in its Form ADV) when it allowed its co-advisor Investus to invest Mr. Bouchard's irreplaceable, long-term IRA funds in the peer-to-peer lending program rather than its proprietary mutual funds. Matson also breached the Agreements by failing to contact Mr. Bouchard to discuss the highly irregular withdrawals from his IRA and to advise him of the true nature of the peer-to-peer loans, if not outright reverse the transactions. It is beyond dispute that Matson knew that Mr. Bouchard withdrew $350,000 – *i.e.,* more than one-third of the account – from his long-term IRA *just months after the account was opened,* and that he withdrew another $50,000 only a few months later. Upon learning of either of these withdrawals, it was Matson's duty to contact Mr. Bouchard because these transactions were highly "suspicious" – withdrawal of a substantial portion of a recently established, long-term IRA by a client planning for retirement with the stated objective of "capital preservation" obviously raises a host of red flags. This is especially true because the withdrawals triggered massive adverse tax consequences and required Matson to rebalance Mr. Bouchard's account. Matson plainly breached the Agreement by not contacting Mr. Bouchard at any time about the suspicious withdrawals (or taking any action at all), despite the significant risks and costs. Had it done so, all of Mr. Bouchard's losses would have been avoided.

## 2.   Breach of Fiduciary Duty

As an RIA, Matson was also undeniably acting in a fiduciary capacity, as a matter of law. Under the Agreements, Mr. Bouchard granted Matson *full discretion to manage* his IRA account, and as an RIA with discretionary authority over the account, Matson is subject to the Investment Adviser's Act of 1940, 15 U.S.C. § 80b-1 *et seq.* ("IAA"), which establishes fiduciary standards that govern the conduct of investment advisers in the handling of their clients' investments. *See,*

*Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 84 S. Ct. 275, 280 (1963) ("The Investment Advisers Act reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship."); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 17, 100 S. Ct. 242 (1979) ("section 206 [of the Investment Advisers Act of 1940] establishes 'federal fiduciary standards' which govern the conduct of investment advisers...."). In fact, Matson expressly acknowledged in its Agreements with Mr. Bouchard that it was acting as his "fiduciary." (*See,* Exhibit 2: Agreement, p. 28).

This fiduciary duty governed all aspects of Matson's advisory relationship with Mr. Bouchard, and clearly extended to the selection of investments in Mr. Bouchard's accounts. Indeed, the discretion granted in the Agreements was for the express purpose of trading, monitoring, and managing Mr. Bouchard's investments. Thus, Matson not only acknowledged that it was obligated to act as Mr. Bouchard's fiduciary, but it also entered an Agreement to exercise discretionary authority over his accounts, which under well-established law meant Matson served as his fiduciary.

"The fiduciary duty is the highest standard of care recognized under the law and serves as a bedrock principle of investor protection." *Southern California Meat Cutters Unions v. Investors Research Co.,* 687 F. Supp. 506 (509 (C.D. Cal. 1988). Accordingly, under federal securities law and Ohio law, an investment adviser must act with the utmost good faith and loyalty, solely in the client's best interest. Specifically, an adviser must (1) make full and fair disclosure, (2) exercise the skill and prudence of his profession, and (3) *monitor* the account and adjust for changes in the market. *See* Investment Advisors Act of 1940, 15 U.S.C.A 80b-1 *et. seq.*

As fiduciaries, investment advisers owe their clients an "affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ

13

reasonable care to avoid misleading clients." *SEC v. Capital Gains, supra.* 375 U.S. at 194. As the fiduciary duty arises out of a relationship of trust, it clearly goes beyond the mere duty not to lie or deliberately omit material facts. *See, e.g., McGinn v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 736 F. 2d 1254 (Minn. App. 1984).

An investment adviser handling a discretionary account also owes a duty to his client to monitor the account on an ongoing basis. *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F. Supp. 951 (E.D. Mich. 1978) *aff'd* 647 F. 2d 165 (6th Cir. 1981). Indeed, for a discretionary account, a broker or adviser is required to "keep informed regarding the changes in the market which affect his customer's interest and act responsively to protect those interests." *Id.* at 953.

Here, Matson clearly violated its fiduciary obligations under federal law and the Agreements in numerous ways. First, Matson was undeniably aware of these withdrawals from Mr. Bouchard's IRA, since it was managing the IRA and would have to rebalance the remaining assets in the account due to the withdrawals. Obviously, these withdrawals were highly suspicious – over one third of a newly-established, long-term IRA for a client planning for retirement whose investment objective was "capital preservation", and which also resulted in a massive adverse tax event. This clearly should have raised enormous red flags – yet Matson did not contact Mr. Bouchard to discuss these withdrawals and took no action to safeguard Mr. Bouchard's investments.

In addition, Burns' scheme began in 2017 and more than 50 other Matson clients had already been impacted before Mr. Bouchard opened his IRA with Matson. By 2020, that number had grown dramatically and over 100 Matson clients (now including Mr. Bouchard) had been

defrauded.[2]  Thus, Matson should have uncovered its Co-Advisors' fraud long before he stole a third of Mr. Bouchard's IRA, and its failure to investigate Burns or the peer-to-peer investments involving scores of Matson client accounts was a violation of its fiduciary duty to manage, monitor and safeguard Mr. Bouchard's assets with the utmost good faith, in Mr. Bouchard's best interest. Indeed, Matson clearly had a duty to know of and understand the peer-to-peer loan program given that it involved Matson-managed accounts and Matson's Co-Advisor.  Plainly, Matson did not exercise the utmost good faith and failed to adequately monitor   Mr. Bouchard's accounts and to communicate suspicious transactions to him, and thus breached its fiduciary duty to Mr. Bouchard.

### 3.     Negligence

Finally, Matson failed to exercise even reasonable care to monitor and protect the funds it managed in Mr. Bouchard's IRA.  It failed to take any action even though it was aware of these irregular and suspicious withdrawals from Mr. Bouchard's IRA – and it failed to investigate Investus, Burns, or the peer-to-peer program, even though more than 100 of its clients were defrauded by the peer-to-peer loan program.  In addition, Matson breached its duty to Mr. Bouchard, pursuant to C.F.R. § 275.206(4)-7, to adopt and implement written policies and procedures reasonably designed to prevent its co-advisor from causing an unreasonable risk of harm the assets its clients entrusted to it to manage and invest, and further, to prevent violation of the Investment Advisors Act of 1940. Further, Matson breached its duty to supervise Mr. Burns under 15 U.S. Code § 80b–2.   Thus, Matson breached the standard of care owed by an RIA to its client, and is also liable to Mr. Bouchard for its negligence.

---

[2]  https://www.ajc.com/ajcjobs/class-action-suit-filed-against-missing-adviser/5MREV7QESJFHHH4YN2FUDL4GWQ/

## DEMAND FOR RELIEF

On the basis of each of the claims set forth above, Mr. Bouchard is entitled to recover the following damages:

(a)    all losses which resulted from the peer-to-peer program outlined in the Note, including unnecessary adverse tax consequences, in an amount to be proven at the hearing;

(b)    8% interest on the principal balance of the Note from September 2020 until the date of repayment, as provided in the Note;

(c)    post-judgment interest from the date of the final Award until the date of repayment;

(d)    attorneys' fees and costs of this arbitration, as provided under Ohio law as well as in the Note.

## DEMAND FOR ARBITRATION

Based on the foregoing, Mr. Bouchard respectfully requests arbitration of his dispute with Matson before an arbitration panel in Hamilton County, Ohio acting under the sponsorship of the American Arbitration Association.

This 11th day of November 2020.

Respectfully submitted,

DOVIN | FICKEN LLC

Edward J. Dovin

Allison S. H. Ficken

Attorneys for Claimant

Monarch Plaza
3414 Peachtree Road, NE
Suite 625
Atlanta, Georgia 30326
(770) 829-3869 – telephone
(770) 829-3865 - facsimile

16



AMERICAN
ARBITRATION
ASSOCIATION·   INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION·

1101 Laurel Oak Road
Voorhees, NJ 08043

November 12, 2020

Chris Burns
Matson Money, Inc.
5955 Deerfield Boulevard
Mason, OH 45040
Via Email to: info@matsonmoney.com

**Case Number: 01-20-0015-6651**

James Bouchard
-vs-
Matson Money, Inc.

Dear Parties:

The claimant has filed with us a demand for arbitration. The American Arbitration Association ("AAA") has determined that this arbitration arises out of a consumer agreement and, as such, the Consumer Arbitration Rules ("Consumer Rules") apply to this dispute. The Consumer Rules may be found on our website at www.adr.org.

Under R-12 of the Consumer Rules, businesses that provide for AAA arbitration in a consumer contract are obligated to submit their current or proposed consumer agreements to the AAA for review and inclusion on the Consumer Clause Registry ("Registry"). The AAA reviews the agreement for material compliance with the due process standards of the Consumer Due Process Protocol ("Protocol") and the Consumer Rules. The AAA's review is administrative; it is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable.

This business has not previously submitted its consumer arbitration clause for review. As such, the AAA will review the clause for this matter on an expedited basis. The additional fee for this expedited review is $250, payable by the business.

**The business is also directed to submit its current consumer arbitration clause for inclusion on the Registry at** https://www.adr.org/Consumer **at which time the business will also incur a $500 Registry fee.** Once the business' clause is registered, it will no longer be assessed the $250 additional expedited review fee on each consumer case filed.

**We note that the arbitration provision has a material or substantial deviation from the Consumer Rules and/or Protocol. Specifically, the provision states:**

*ANY ARBIRTRATION SHALL BE HELD IN THE COUNTY OF HAMILTON, STATE OF OHIO.*

The above provision violates Principle 7: Reasonably Convenient Location. If a party believes that there are additional conflicts with the Protocol and/or Consumer Rules, those issues may be brought before the arbitrator once one has been appointed.

However, so that we may commence administration of this matter, **we are requesting that the business waive the above provision(s) and agree to have this matter and any future consumer arbitrations filed under this agreement administered under the Consumer Rules and in compliance with the Protocol.** Please confirm



EXHIBIT
3

your agreement to waive the above-quoted provision by signing and dating below and returning a copy of this letter. Absent receipt of the requested waiver, the AAA will decline to administer this dispute and possibly any future consumer arbitrations involving this business. Please note that pursuant to the R-1(d) of the Consumer Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution. In addition, Rule R-9 states either party may choose to take the claim to small claims court if the claim is within the jurisdiction of that court.

| | |
|---|---|
| Business (authorized representative) | Date |

Under the Consumer Rules, the consumer pays a filing fee of $200 and the business pays a filing fee of $300. We have received the consumer's $200 portion of the filing fee. So that the filing requirements are complete, **the business is requested to submit filing fees of $300, the expedited consumer clause review fee of $250 and its arbitrator's compensation deposit of $2,500, totaling $3,050.**

**Please note payment should be submitted by credit card or electronic check. Please confirm the email address AAA may send a secured paylink with instructions to submit payment via either method.** In the event that payment is being made by a third party, such as an insurance company, please request that payment be sent directly to the business' representative. The business' representative should then forward payment to the AAA in accordance with the foregoing instructions.

**The requested payment and waiver should be received no later than November 30, 2020** and the AAA may decline to administer this dispute if the business does not timely respond. It should be noted that the consumer's satisfaction of the filing requirements triggers the business' obligation to promptly pay its share of the filing fees under the rules and the business may owe all or a portion of the filing fees even if the matter is settled or withdrawn. The AAA will refund any overpayments received from the consumer with the filing.

No answering statement or counterclaim is due at this time and the parties will be notified of the applicable deadlines upon satisfaction of all the filing requirements.

Thank you for your attention to this matter. If you have any questions please feel free to contact us.

Sincerely,
Consumer Filing
Direct Dial: (877)495-4185
Email: ConsumerFiling@adr.org
Fax: (877)304-8457

cc:     Edward J. Dovin, Esq.
        Dovin Ficken, LLC
        3414 Peachtree Road Northeast
        Monarch Plaza, Suite 625
        Atlanta, GA 30326
        Via Email to: ejdovin@dovinficken.com



425 Walnut Street , Suite 1800
Cincinnati, OH 45202
Tel: 513.381.2838 | Fax: 513.381.0205
taftlaw.com

**RUSSELL S. SAYRE**
513-357-9304
sayre@taftlaw.com

November 12, 2020

**BY EMAIL**
American Arbitration Association
ConsumerFiling@adr.org
1101 Laurel Oak Road
Voorhees, NJ 08042

Re:   Case No. 01-20-0015-6651 (Matson Money)

Dear Sir or Madam:

This firm is counsel to Matson Money, Inc. ("Matson Money"). I write in response to your correspondence dated November 12, 2020, advising Matson Money of the filing of the referenced arbitration, and asking that Matson Money waive the Hamilton County, Ohio venue provision in the relevant Investment Management Agreement ("Agreement") with Claimant James Bouchard, prior to AAA's commencement of administration of the matter.

We will not at this time address AAA's request that Matson Money waive the venue provision, because there is a more fundamental threshold issue that renders the request moot. Specifically, this matter is not arbitrable at this time. The Agreement and the provisions of section 15 thereof provide that a party may not invoke the Agreement's arbitration provision while the claimant is a member of a putative class in a pending class action. The relevant portion of section 15 of the Agreement says:

> *NOTWITHSTANDING THE FOREGOING, NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; OR WHO IS A MEMBER OF A PUTATIVE CLASS ACTION WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL (I) THE CLASS CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE ACCOUNT OWNER IS EXCLUDED FROM THE CLASS BY THE COURT.  SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.*

Taft Stettinius & Hollister LLP

Chicago / Cincinnati / Cleveland / Columbus / Dayton / Delaware / Denver / Indianapolis / Minneapolis / Northern Kentucky / Phoenix

28231048v1

**EXHIBIT**
**4**

American Arbitration Association
November 12, 2020
Page 2

Claimant Bouchard is a member of the putative class in *Susan Zimmerman v. Matson Money, Inc.*, (N.D. Georgia No. 1:20-cv-04409-WMR (copy of complaint attached), in which Matson Money is named as a defendant. The allegations in Mr. Bouchard's arbitration demand are substantively identical to the claims asserted by Ms. Zimmerman on behalf of the putative class. As such, Mr. Bouchard's claims are not subject to arbitration, whatever the venue, until and unless class certification is denied or Mr. Bouchard opts out of, or is otherwise excluded from, a certified class. This, of course, makes sense because a litigant cannot pursue the same claims in different forums, given the risk of double recovery, inconsistent rulings, etc.

Please let me know if you have questions or wish to discuss this further.

Sincerely yours,

*Russell S. Sayre*

Russell S. Sayre

RSS/ljm

cc:    Edward J. Dovin, Esq. (via email: ejdovin@dovinficken.com)

28231048v1

# Dovin | Ficken

Dovin Ficken LLC  Monarch Plaza, 3414 Peachtree Road, NE Suite 625 Atlanta, Georgia 30326
Main: (770) 829-3869  Fax: (770) 829-3865  dovinficken.com

Edward J. Dovin
Direct (770) 829-3866
ejdovin@dovinficken.com

November 13, 2020

**Via Email: <ConsumerFiling@adr.org>**
American Arbitration Association
1101 Laurel Oak Road
Voorhees, New Jersey 08042

    *Re:*    *James J. Bouchard ("Bouchard") v. Matson Money, Inc. ("Matson")*
           **AAA Case No. 01-20-0015-6651**

Dear Case Administrator:

    This letter serves as Mr. Bouchard's response to Respondent Matson's letter of November 12, 2020 objecting to arbitration of this dispute. Matson's letter raises arguments that are at best outrageous and at worst in bad faith. Either way, they are demonstrably wrong. On that basis, Matson's argument in its November 12th letter should be rejected summarily as baseless.

    *First, a cursory reading of the arbitration clause at issue makes it crystal clear that the language Matson cites does not say what Matson claims.* Indeed, Matson highlights only *part* of a sentence—that Mr. Bouchard could be a member of a "putative" class action if he elected that remedy—and argues on that basis that he should be deprived of his right to arbitrate his claims against Matson. But Matson ignores the first half of the sentence—which changes the meaning of the excerpt Matson quotes out of context. The deliberately omitted portion of the sentence provides:

> ... NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT **AGAINST** ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; OR WHO IS A MEMBER OF A PUTATIVE CLASS ACTION WHO HAS NOT OPTED OUT OF THE CLASS ....

(Investment Management Agreement, Section 15). Thus, no person (*i.e.*, Matson) can enforce the arbitration provision *against* any putative class member (*i.e.*, Mr. Bouchard) were he to file or join in any class action. It does *not* say that a putative class member cannot enforce the arbitration provision against Matson—and yet, that's exactly what Matson argues. *Thus, Matson's argument is facially meritless based on the clear and unequivocal language of the agreement.*


EXHIBIT
5

*Secondly, Matson's attempt to avoid its own arbitration provision under these circumstances is outrageous.* Indeed, Matson itself chose to include the arbitration clause in its consumer contract of adhesion with Mr. Bouchard, and it drafted the language of that provision. Now it is attempting to misinterpret the language of that provision so as to *deprive* Mr. Bouchard of his right to arbitrate.

Moreover, no law in this land would permit a defendant *to force* a consumer to participate in a class action against his will and *involuntarily deprive* him of his right to demand arbitration pursuant to an arbitration provision in the defendant's own contract of adhesion. On the contrary, the U.S. Supreme Court long ago established that each class member has a due process right to opt out of the class action. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985); *see also, Ticor Title Ins. Co. v. Brown,* 982 F. 2d 386 (9th Cir. 1992), cert denied 511 U.S. 117 (1994); Fed. R. Civ. P. 23(b)(3) (upon receiving a class action notice, a class member can opt out of the class if the class member prefers not to participate). *Thus, Matson's argument is also legally baseless. Indeed, were Matson's argument correct, it would lead to the absurd result of allowing Matson to unilaterally avoid its own arbitration provision and force Mr. Bouchard to join a class action against his will.*

Furthermore, Mr. Bouchard did not file the putative class action or participate in it in any way, and the putative class action has not been certified (and may never be certified). Mr. Bouchard, a 64-year old who recently retired, cannot be forced to wait months, or even years, to see if the class is certified by the court before pursuing his claims in arbitration, as Matson is attempting to accomplish through its duplicitous and misleading argument.

Finally, it is worth noting that the provision prohibiting Matson from enforcing the arbitration agreement against any class member is intended to protect the consumer's right to pursue a class action if he elects that remedy. It does not mean that one consumer no longer has the right to pursue his claims in arbitration merely because another consumer filed a "putative" class action, as Matson is attempting to argue. *That would in effect allow one consumer to waive or stay the right to arbitration on behalf of all other consumers by filing a "putative" class action. No court would ever hold that one party can waive another party's rights without that party's consent.*

Not only is Matson's position wholly without merit on that point, but this issue almost always comes up in the opposite situation—*i.e.,* where a defendant is seeking to avoid a class action and force the class members into individual arbitrations (not a defendant seeking to avoid arbitration and force the claims into a class action, as Matson is trying to do here). In such cases, where a defendant seeks to avoid a class action and force class members to arbitrate, the majority of courts have held that *a defendant* cannot enforce an arbitration provision in a consumer contract *against class members* in order to avoid the class action and force the class members to pursue separate arbitration actions. *See e.g., Watkins v. Simmons and Clark, Inc.,* 618 F. 2d 398 (6th Cir. 1980); *Johnson v. Tele-Cash, Inc.,* 82 F. Supp. 2d 264 (D. Del. 1999). That is why this language was included in Matson's arbitration agreement, expressly clarifying that "no person" (*i.e.,* Matson) can enforce the arbitration provision *against* any member of a putative class action (*i.e.,* Mr. Bouchard). Thus, these court rulings, and the language in Matson's own arbitration provision, are meant to protect the consumer by allowing him to proceed in a class action instead

of arbitration *should he choose to do so*. Under no possible reading of the law or the language in this arbitration provision could Matson avoid its own arbitration agreement and force a consumer like Mr. Bouchard to join in a putative class action instead of arbitration *against his will*.

In conclusion, Mr. Bouchard has a contractual right to arbitrate his claims against Matson immediately, without awaiting the results of a putative class action, pursuant to Matson's own consumer agreement, and nothing in Matson's arbitration provision deprives him of that right. Furthermore, Mr. Bouchard has not waived that right and he cannot be involuntarily deprived of that right merely because one other consumer filed a putative class action.

Very truly yours,

DOVIN | FICKEN LLC

Edward J. Dovin

cc:    David Bouchard
       James Bouchard
       Anne Bouchard

hnj/EJD
DF/Bouchard/Pleadings/Cl Resp Matson obj arb



AMERICAN
ARBITRATION
ASSOCIATION®

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

1101 Laurel Oak Road
Voorhees, NJ 08043

December 1, 2020

Edward J. Dovin, Esq.
Dovin Ficken, LLC
3414 Peachtree Road Northeast
Monarch Plaza, Suite 625
Atlanta, GA 30326
Via Email to: ejdovin@dovinficken.com

**Case Number: 01-20-0015-6651**

James Bouchard
-vs-
Matson Money, Inc.

Dear Parties:

This will acknowledge receipt of the parties comments and the issue for arbitrability can be raised to the arbitrator upon appointment. The AAA will proceed with administration pursuant to the Rules.

We have not received the administrative fees and arbitrator compensation from respondent as requested in our previous correspondence. **Respondent is requested to remit payment in the amount of $3,050 to the AAA to be received by December 15, 2020.** As the claimant has met the filing requirements, respondent's fee is due regardless of whether the case settles or is withdrawn.

If payment was already sent, please send an email with the payment details so that payment is properly allocated. If this non-payment is simply an oversight on respondent's behalf, we trust payment will be made without delay.

**We have also not received the business' agreement to waive the deviations identified in its consumer arbitration agreement and have this and all consumer arbitrations heard in compliance with the AAA's Consumer Due Process Protocol. Respondent is requested to sign where indicated on our previous correspondence and return the signed copy to us when remitting the fees. Both payment and the signed waiver are required for the AAA to continue with administration of this dispute.**

Please note:  should the business not comply with our request by the above response date, we may decline to administer any other consumer disputes involving this business and request that the business remove the AAA name from its arbitration clause so that there is no confusion to the public regarding our decision. Furthermore, pursuant to the R-1(d) of the Consumer Arbitration Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution.

If we do not timely receive the business' portion of the filing fees, we will notify the parties that we have administratively closed this case and refund any payment received from claimant. **Please note payment should be submitted by credit card or electronic check. Please confirm the email address AAA may send a secured paylink with instructions to submit payment via either method.** In the event that payment is being made by a third party, such as an insurance company, please request that payment be sent directly to the business' representative. The business' representative should then forward payment to the AAA in accordance with the foregoing instructions.



Thank you for your attention to this matter. If for any reason respondent will not be able to comply with our request by the noted response date, please send an email requesting an extension prior to the deadline. Please email consumerfiling@adr.org if you have any questions.

Sincerely,

Consumer Filing Team
Email: ConsumerFiling@adr.org
Fax: (877)304-8457



AMERICAN
ARBITRATION
ASSOCIATION®

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

1101 Laurel Oak Road
Voorhees, NJ 08043

December 22, 2020

Edward J. Dovin, Esq.
Dovin Ficken, LLC
3414 Peachtree Road Northeast
Monarch Plaza, Suite 625
Atlanta, GA 30326
Via Email to: ejdovin@dovinficken.com

Russell S. Sayre, Esq.
Taft Stettinius & Hollister, LLP
425 Walnut Street
Suite 1800
Cincinnati, OH 45202-3957
Via Email to: sayre@taftlaw.com

**Case Number: 01-20-0015-6651**

James Bouchard
-vs-
Matson Money, Inc.

Dear Parties:

As of this date we have not received the required waiver and fees from Matson Money, Inc. in this matter.
Accordingly, we must decline to administer this case and have closed our file. According to R-1(d) of the
Consumer Arbitration Rules, should the AAA decline to administer an arbitration, either party may choose to
submit its dispute to the appropriate court for resolution.

Any payment submitted by a party will be refunded shortly.

Further, because Matson Money, Inc. failure to remit the foregoing constitutes a failure to adhere to our policies
regarding consumer claims, we may decline to administer future consumer arbitrations involving Matson Money,
Inc. The AAA's consumer policies can be found on the AAA's website, www.adr.org . We request that Matson
Money, Inc. remove the AAA name from its consumer arbitration clause so that there is no confusion to the
public regarding our decision.

If Matson Money, Inc. advises the AAA in the future of its intention to comply with the AAA's Consumer
Arbitration Rules and if applicable, resolves any outstanding payment obligations, the AAA may consider at its
sole discretion, accepting newly filed consumer cases going forward.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain
electronic case documents in our electronic records system. Such electronic documents may not constitute a
complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely,
electronic case documents will be destroyed 18 months after the date of this letter.

If you have any questions, please email ConsumerFiling@adr.org.



Sincerely,

Consumer Filing Team
Email: ConsumerFiling@adr.org
Fax: (877)304-8457



## IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
**136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303**
### SUMMONS

James J. Bouchard

_____  ) Case
                         ) No.:_____**2021CV345442**_____

_____  )
                         )
**Plaintiff,**           )
                         )
vs.                      )
Matson Money, Inc.       )
_____  )
                         )
                         )
_____  )
**Defendant**            )
                         )
                         )
                         )

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://efilega.tylerhost.net/ofsweb and serve upon plaintiff's attorney, whose name and address is:

> Edward J. Dovin, Dovin Ficken LLC
> 3414 Peachtree Road NE, Suite 625
> Atlanta, GA 30326
> ejdovin@dovinficken.com

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This _____**2/4/2021**_____ day of _____, 20 _____

                                    Honorable Cathelene "Tina" Robinson
                                    Clerk of Superior Court
                                    By_____
                                                Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

                                    _____
                                                Deputy Sherriff

**Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used**

Fulton County Superior Court
***EFILED***TB
Date: 2/24/2021 2:14 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

JAMES J. BOUCHARD,            :
                             :
    Movant,              :
                             :
                             :   Civil Action
v.                           :
                             :   File No. 2021CV345442
MATSON MONEY, INC.,          :
                             :
    Respondent.          :

## MOTION FOR APPOINTMENT OF A SPECIAL PROCESS SERVER

COMES NOW Movant James J. Bouchard ("**Bouchard**"), by and through his attorneys of record, pursuant to O.C.G.A. § 9-11-4, and moves the Court for an Order Appointing a Special Process Server to serve Respondent Matson Money, Inc. ("**Matson**") with a copy of the Summons and Petition to Compel Arbitration in this action, and in support, shows the Court as follows:

1.    Respondent Matson is an Ohio corporation doing business in Georgia, subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute. Matson's registered agent is Taft Service Solutions Corp., 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202.

2.    Movant Bouchard has contacted Action Legal Process ("**Action**"), a private process server located in Cincinnati since 1994. (A copy of the homepage from Action's website is attached as Exhibit 1). It is anticipated that Angela Montgomery, a licensed process server employed by Action, will serve the Petition and Summons to Matson's registered agent.

3.    Neither Angela Montgomery nor any other person employed by Action is a party to this action, nor related to Bouchard by blood or marriage, nor employed by Bouchard or his attorney.

Fulton County Superior Court
***EFILED***QW
Date: 2/25/2021 9:46 AM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
### STATE OF GEORGIA

JAMES J. BOUCHARD,
    Plaintiff,

    v.

MATSON MONEY, INC.,
    Defendant.

CIVIL ACTION FILE NO.
2021CV345442

### ORDER APPOINTING SPECIAL PROCESS SERVER

This matter having come before the Court upon Plaintiff's Motion for Appointment of a Special Process Server, and having reviewed the written submissions, and for good cause shown,

IT IS HEREBY ORDERED that Angela Montgomery be appointed as special process server to perfect service of the Summons and Petition to Compel Arbitration upon Defendant Matson Money, Inc.

**SO ORDERED** this 25 day of February , 2021.

_____
**Presiding Judge**
Fulton County Superior Court
Atlanta Judicial Circuit

**Filed and served electronically via Odyssey eFileGA**

4.      Angela Montgomery is a citizen of the United States and is above the age of eighteen.

WHEREFORE, Movant Bouchard respectfully requests that the Court issue an Order appointing Angela Montgomery as special process server to perfect service of the Summons and Petition to Compel Arbitration upon Respondent Matson.

This 24th day of February, 2021.

Respectfully submitted,

DOVIN | FICKEN, LLC

/s/Allison S. H. Ficken
Allison S. H. Ficken
Georgia Bar No. 355875

Monarch Plaza
3414 Peachtree Road, NE
Suite 625
Atlanta, Georgia 30326
(770) 829-3896
(770) 829-3865 (fax)
ejdovin@dovinficken.com
ahficken@dovinficken.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day caused the within and foregoing MOTION FOR APPOINTMENT OF A SPECIAL PROCESS SERVER to be served via Federal Express in a properly addressed envelope with adequate postage thereon to:

> Matson Money, Inc.
> c/o Taft Service Solutions Corp.
> 425 Walnut Street
> Suite 1800
> Cincinnati, Ohio 45202

This 24th day of February, 2021.

/s/Allison S. H. Ficken
Allison S. H. Ficken
Georgia Bar No. 355875

.

Monarch Plaza
3414 Peachtree Road NE
Suite 625
Atlanta, Georgia 30026
(770) 829-3869
(770) 829-3865 (fax)