IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., as an organization; LEAGUE OF WOMEN VOTERS OF GEORGIA, INC., as an organization; GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC., as an organization; COMMON CAUSE; as an organization; LOWER MUSKOGEE CREEK TRIBE, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action Case No. _____ |
| v. | ) ) | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| BRAD RAFFENSPERGER, in his official capacity of the Secretary of State for the State of Georgia, REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacities as members of the State Election Board, | ) ) ) ) ) ) ) | **52 U.S.C. § 10301, 42 U.S.C. § 1983; First, Fourteenth and Fifteenth Amendments to the United States Constitution)** |
| Defendant. | ) ) ) ) | |

_____

## PRELIMINARY STATEMENT

1.      This is a voting rights lawsuit filed pursuant to Section 2 of the Voting

Rights Act of 1965 (52 U.S.C. § 10301) and 42 U.S.C. § 1983[1] seeking prospective

declaratory and injunctive relief against Brad Raffensperger, in his official capacity

as the Georgia Secretary of State; Rebecca N. Sullivan, David J. Worley, Matthew

Mashburn, and Anh Le in their official capacities as members of the State Election

Board, to enjoin the enforcement and implementation of Georgia Senate Bill 202

("SB 202"), an omnibus voter suppression bill passed by the Georgia General

Assembly on March 25, 2021 and signed into law the same day by Georgia

Governor, Brian Kemp. [2]

2.      SB 202 is the culmination of a concerted effort to suppress the

participation of Black voters and other voters of color by the Republican State

Senate, State House, and Governor.  In the last two decades, Georgia has

undergone demographic change, namely the increasingly large percentage of the

_____

[1]Plaintiffs anticipate supplementing this Complaint with claims arising under
Section 8 of the National Voter Registration Act of 1993 (52 U.S.C. § 20507,
20510)("NVRA") after notice of NVRA violations are served on the appropriate
parties and the pre-litigation notice period expires.
[2]A copy of SB 202 as passed by the Georgia General Assembly on March 25, 2021
("SB 202/AP") is available on the Georgia General Assembly's website at this
link: https://www.legis.ga.gov/api/legislation/document/20212022/201498 (last
checked 3/27/21).

electorate comprised of Black voters and other voters of color.  Additionally, as demonstrated by election analyses, Black voters and voters of color usually provide strong support to Democratic candidates. The demographic changes and the voting patterns of voters of color have resulted in evolving political change in Georgia.  After several cycles of Republican dominance, Democratic statewide candidates almost won election in 2018 and then won the races for President in 2020 and two Senatorial races in 2021.  Unable to stem the tide of these demographic changes or change the voting patterns of voters of color, these officials have resorted to attempting to suppress the vote of Black voters and other voters of color in order to maintain the tenuous hold that the Republican Party has in Georgia. In other words, these officials are using racial discrimination as a means of achieving a partisan end. These efforts constitute intentional discrimination in violation of the Constitution and Section 2 of the Voting Rights Act.

3.     SB 202's sweeping changes are aimed at suppressing the vote of Black voters and other voters of color.  The law targets early in-person voting, voting by absentee ballots, and the use of absentee ballot drop boxes - means of voting that have been increasingly used by Black, Latinx, Asian American, members of indigenous populations and other voters of color.  In the most recent

3

elections in 2020 and 2021, voters of color used these methods of voting in numbers not seen before. In response, the Georgia General Assembly enacted SB 202 to limit access to these voting methods and burden their use.

4.      Despite the fact that many of the provisions of SB 202 will add to the problems of long lines and delays at polling locations by making absentee mail voting and in-person early voting harder, SB 202 even penalizes voters forced to wait in long lines to vote for protracted periods by criminalizing the simple act of individuals and charitable organizations providing voters with water when they are waiting in line to vote. More often than not, it is Black voters or other voters of color who are negatively impacted by long lines and delays at the polls and stand to suffer most when charitable organizations can no longer provide such items to voters waiting to vote.

5.      SB 202 also threatens the power of county election boards, responsible for ensuring that voters of color are able to participate equally in the political process, by stripping the Secretary of State of his vote on the State Election Board, replacing the Secretary of State with a voting member appointed by the General Assembly and granting the State Election Board the power to effectively take over the County Board. SB 202, Section 5.

6.     The provisions of SB 202, viewed individually or collectively, threaten the fundamental right to vote of all Georgians, but their impact will be felt most intensely by persons of color, which is precisely what the legislature intended.

7.     This Court should declare SB 202 unlawful and unconstitutional, and permanently enjoin its implementation.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a) because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act, and 28 U.S.C. § 1331 because it arises under the laws of the United States.

9.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

11.     Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP ("Georgia NAACP") is a non-partisan, interracial, nonprofit membership

organization that was founded in 1941. Its mission is to eliminate racial

discrimination through democratic processes and ensure the equal political,

educational, social, and economic rights of all persons, in particular African

Americans. It is headquartered in Atlanta and currently has approximately 10,000

members.

12.    The Georgia NAACP works to protect voting rights through litigation,

advocacy, legislation, communication, and outreach, including work to promote

voter registration, voter education, GOTV efforts, election protection, and census

participation.

13.    The Georgia NAACP has branches in counties across the state of

Georgia that are involved in voter registration, voter assistance, voter education,

election protection, grassroots mobilization, and get-out-the-vote efforts, including

Sunday early voting events, such as "Souls to the Polls."

14.    The Georgia NAACP has sought to prevent efforts to suppress or

disenfranchise African American voters and has been involved in voting rights

litigation in Georgia to vindicate their rights.

15.    The Georgia NAACP engages in voter outreach efforts, including

voter education on voting in-person during early voting, voting by mail and voting

in person on election day.

16.    The Georgia NAACP has engaged in GOTV campaigns. One of the key components of these campaigns is providing accurate information regarding mail-in ballots to the Georgia NAACP's membership and the rest of the public.

17.    The Georgia NAACP has developed materials and worked with local NAACP branches to educate its members and the public about voting by mail, including providing information concerning the availability and location of mail ballot drop boxes during the 2020 general election and 2021 runoff election cycle. The Georgia NAACP also developed messaging and materials regarding mail ballot drop box locations in particular counties.

18.    The Georgia NAACP has conducted text and phone banking programs and reached out to voters throughout Georgia to encourage voter participation and to educate the public about the voting process, including about voting by mail.

19.    Many of the Georgia NAACP's members have voted by mail in the past and stand to be negatively impacted by the substantial changes to Georgia's vote by mail procedures that have been enacted as part of SB 202.  Many more will be impacted by the changes to the availability of absentee ballot drop boxes, changes to early voting times and days and the requirement of a sworn affidavit for voters who go to the wrong precinct to vote prior to 5 p.m., as set forth in SB 202.

Many Georgia NAACP members are at risk of being disenfranchised by the changes in SB 202.

20.    The Georgia NAACP has an interest in preventing the disenfranchisement of eligible voters, including its members and voters it may have assisted with navigating the voting process.

21.    Due to the substantial changes in absentee voting procedures, absentee ballot drop boxes, early voting periods, restrictions on out of precinct voting, criminalization of line-warming activities (supplying water and snacks to voters in line and other persons who request the refreshments) and the other changes caused by the enactment of SB 202, the Georgia NAACP will not only have to change its messaging to voters of color about these changes, but the NAACP will also have to divert considerable resources from its ongoing election protection, advocacy, and get out the vote efforts to educate and assist eligible voters.

22.    The Georgia NAACP will also have to divert its resources to educate voters about the substantial changes to the mail voting process, and will have to respond to questions from voters who used a mail ballot drop box in the November 2020 election and will be confused by the fact that they are not available outside early voting locations in the future.

23.    The Georgia NAACP has traditionally provided transportation to the polls for voters on Election Day. The Georgia NAACP will have to divert resources to physically transport voters to the county board of elections to drop off their mail ballots or to polling places or early voting locations to vote in person if they cannot vote by absentee.  The nature and scope of the Georgia NAACP's voter assistance efforts will need to change if voters do not have access to a drop box or mail ballots are rejected due to the burdensome ID requirements, the complicated changes for completing absentee ballot applications and returning absentee ballots.

24.    The Georgia NAACP's additional efforts to educate voters whose mail ballots are rejected due to the new ID requirements and other procedures will force the Georgia NAACP to have to divert substantial resources away from core activities such as voter registration and other efforts such as criminal justice work. This is due to the fact that the Georgia NAACP's resources are limited.

25.    Plaintiff THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC. ("GCPA") is a Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia. The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members.

9

26.    In addition to its main office in Atlanta, the GCPA has field offices in Athens, Albany, Augusta, Macon, Savannah, and LaGrange, Georgia where it is able to provide outreach and support to voters and prospective voters of color and underserved communities outside of the Metro Atlanta area.

27.    During the 2020 elections and the January 5, 2021 runoff cycle, the GCPA's voter outreach efforts were conducted in the greater Metro Atlanta region as well as throughout other areas of Georgia from the aforementioned field offices and covered approximately 88 counties in the state.

28.    The GCPA encourages voter registration and participation, particularly among Black and other underrepresented communities of color in Georgia. The GCPA's support of voting rights is central to its mission. The organization has committed, and continues to commit, time and resources to protecting voting rights through advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, GOTV efforts, election protection, census participation and litigation.

29.    The GCPA conducts voter registration drives, voter ID assistance, "Souls to the Polls" GOTV events during Sunday early voting and other get out the vote ("GOTV") efforts in Georgia that seek to encourage voter participation among Black and Brown voters and voters in historically underserved communities of

color. The GCPA in coalition with other civic engagement organizations in Georgia also participates in voter education and voter empowerment programs.

30.    GCPA's voter education and empowerment programs have included, but were not limited to, educating prospective voters about how to register to vote and to confirm their registration status; educating voters about the options to vote in-person during advanced voting, in-person on Election Day and by mail via absentee ballot; providing information to voters about accessing absentee ballot drop boxes to cast their absentee ballots safely and securely, and helping voters to understand the new voting system implemented for the first-time during the 2020 election cycle statewide.

31.    The GCPA has also distributed civic education materials to voters and prospective voters; arranged for rides to the polls for voters; and supported the Georgia Election Protection field program in order to provide assistance to voters on the ground near polling sites.

32.    GCPA also participates in media interviews, sponsors Public Service Announcements (PSAs), places billboard ads, conducts phone banking, and engages in text message campaigns to educate voters and to encourage participation.

33.    The GCPA has an interest in preventing the disenfranchisement of eligible voters who now run the risk of becoming disenfranchised as a result of the new restrictions imposed by SB 202, including substantial and burdensome ID requirements for absentee by mail voting; limitations on early voting days and hours, including Sunday early voting; diminished availability of absentee ballot drop boxes except inside early voting locations during early voting hours, the lack of 24/7 hour access to absentee ballot drop boxes which renders them essentially useless to many voters; the criminalization of "line-warming," activities, i.e., providing water and snacks to people in line to vote and other persons in the vicinity of polling locations; and other unreasonably burdensome restrictions imposed by these new voting changes on voters and election officials alike.

34.    SB 202 will substantially and negatively impact the GCPA's advocacy efforts now and in the future. This law will inevitably cause Black voters and other voters of color negatively impacted by these new restrictions to lose faith that their votes will be counted on an equal basis as white voters. This sense of futility will likely depress turnout in the future and make it more difficult for the GCPA to carry out its mission of encouraging Black voters, other voters of color and voters in underserved communities to register to vote, vote, and to help protect the rights of other Georgians to vote.

35.    Due to the substantial changes in existing Georgia election law and procedures, including the potential imposition of new criminal penalties and significant fines and frees, SB 202 has caused, and will continue to cause, the GCPA to divert a portion of its financial and other organizational resources to educating voters about these changes and assisting voters facing these new restrictions and burdens.

36.    As a result of the enactment of these new restrictions on voting in Georgia, the GCPA has, and will continue to have, fewer resources to dedicate to its other organizational activities, including voter registration drives, GOTV efforts and other projects, unless the Court enjoins enforcement of these new laws.

37.    Plaintiff LEAGUE OF WOMEN VOTERS OF GEORGIA, INC. (League) is a nonpartisan political organization that has worked for the last 101 years to ensure that every person has the desire, the right, the knowledge and the confidence to participate in our democracy. The League's 13 local organizations and nearly 700 members are dedicated to our mission of empowering voters and defending democracy.

38.    From the League's inception, members have worked for good government by studying issues, advocating for reforms, and, through the League's Observer Corps, observing and reporting on the work of all levels of government.

The League is committed to registering voters, regardless of their political affiliation, and is particularly proud of its work, with community partners, in registering new American citizens at citizenship ceremonies. The League is also dedicated to voter education, both through candidate forums and the Vote411.org voter guide. Many League members also assist with get out the vote efforts, poll watching, and serving as vote review panelists.

39.    As part of its mission, the League advocates for expansion of voting opportunities, including through absentee by mail voting, early in-person voting and election day voting. The League expends significant resources in furtherance of its mission, including by organizing voter registration drives, educating the public about the voting process, and assisting voters who have questions or need help navigating the voting process. The League has seen a substantial increase in the number of its members and other individuals who turned out to vote by mail and during early in-person voting during the 2020 election cycle and January 5, 2021 Senate runoff elections.

40.    As a result of the risk of disenfranchisement due to new ID requirements for absentee by mail voting, the League must divert more resources toward educating voters about these new requirements, including, but not limited to, warning them of the risk of disenfranchisement if they fail to provide the

required ID and other required information when applying or absentee ballots and

when returning the ballots; answering questions from members of the public about

these new voting restrictions; and explaining how they impact their right to

vote.  The League will need to devote significant staff time and funds to update

standard training materials and informational booklets to reflect these sweeping

changes.

41.   The League must divert these resources away from its regular

advocacy, voter registration, fundraising, and other activities, affecting its ability to

operate and function with respect to its normal activities.

42.   Plaintiff GALEO LATINO COMMUNITY DEVELOPMENT FUND,

INC. ("GALEO LCDF"); is a non-partisan, nonprofit corporation. GALEO LCDF

is one of the oldest, largest, and most significant organizations promoting and

protecting the civil rights of Georgia's Latinx community. GALEO LCDF has

approximately 165 members across Georgia.

43.   GALEO LCDF's headquarters is located in Norcross, which is in

Gwinnett County, and a substantial amount of GALEO LCDF's civic engagement,

voter registration and get out the vote work takes place in Gwinnett County and

other Metro Atlanta counties. This work includes organizing voter education, civic

engagement, voter empowerment and get out the vote events and conducting voter

registration drives. After Gwinnett County became a covered jurisdiction for Spanish under Section 203 in December 2016, GALEO LCDF has worked also with the Gwinnett County Board of Registration and Elections ("BORE") in an effort to bring its procedures and election materials into compliance with the law's requirements.

44.    During the 2020 election cycle, GALEO LCDF also worked to address challenges facing Gwinnett County's LEP Spanish speaking voters as a result of the impact of the COVID-19 pandemic.

45.    GALEO LCDF sent bilingual mailers to Latinx Gwinnett County voters with information about the presidential primary as well as additional mailers after the primary was postponed due to COVID-19.

46.    GALEO LCDF also sent several rounds of bilingual mailers to all Latinx Georgia voters for both the General Election and the January 5, 2021 runoffs.  GALEO LCDF also ran paid advertisements on Spanish media (radio & TV) to promote voting and educate voters about voting for both elections.

47.    Due to the sweeping changes to many facets of voting that stand to disenfranchise Latinx, language minority voters and voters of color, GALEO LCDF will be forced to divert resources from his voter registration, existing voter education programs, get out the vote (GOTV) activities and other programs to

assist voters, particularly limited English proficient voters and new Americans, in being able to navigate the many changes and challenges of SB 202 that will make it more burdensome for them to vote by absentee ballot, during early voting and in person on Election Day.

48.    Plaintiff COMMON CAUSE is a nonprofit corporation organized and existing under the laws of the District of Columbia. It is one of the nation's leading grassroots democracy-focused organizations and has over 1.2 million members nationwide and chapters in 35 states, including 18,785 members and supporters in Georgia. Since its founding in 1970, COMMON CAUSE has been dedicated to the promotion and protection of the democratic process, including the right of all citizens to vote in fair, open, and honest elections. COMMON CAUSE, at the national level and in Georgia, conducts significant nonpartisan voter-protection, advocacy, education, and outreach activities to endure that voters are registered and have their ballots counted as cast.

49.    In Georgia, COMMON CAUSE has increased its efforts in the areas of election protection, voter education, and grassroots mobilization around voting rights in the state. COMMON CAUSE works on election administration issues with its coalition, much of which is represented by the other plaintiffs in the instant lawsuit.

50.    COMMON CAUSE, alongside other partners in Georgia, created a program to help recruit volunteers to monitor local board of elections meetings. Common Cause also works with these partners in election protection efforts during both midterm and presidential elections. Through its volunteer recruitment for poll monitors, COMMON CAUSE in Georgia monitors an average of five polling locations in 22 counties for a total of 110 polling places. COMMON CAUSE in Georgia additionally engages in online petition drives, soliciting signatures from its members and supporters urging government officials to take certain actions.

51.    COMMON CAUSE in Georgia also works directly with voters who cast provisional ballots to help ensure their ballots can be counted.

52.    During the 2020 election cycle, COMMON CAUSE in Georgia assisted some 6,000 voters who cast provisional ballots to cure those ballots so they could be counted — most were cast because the voter appeared at the wrong precinct.  As a result of the enactment of SB 202, COMMON CAUSE will continue to divert resources that it would apply to other organizational and programmatic resources toward helping voter resolve provision ballot issues, including provisional ballots cast due voters appearing at the wrong precinct, often through no fault of their own.

53.   Plaintiff LOWER MUSKOGEE CREEK TRIBE is a state-recognized tribe located in Grady County on the southwest border of Georgia.  The tribal government is located in the old tribal town of Tama, which is located in Whigham, Georgia.  The tribe has an enrollment of approximately 2,700 members, most of whom live in rural southwest Georgia and northern Florida within a 150-mile radius to Whigham. The tribe operates a civics education program for its members to encourage them to participate in the political process.  The tribe's members are disproportionately poor and likely to be affected by SB202's cutback on voting by mail and criminalization of providing food and water to voters in line at the polls.

54.   The United States Census Bureau's 2019 5-Year American Community Survey (ACS) estimates indicate that 41.6% of American Indians in Georgia do not have a computer at home and that American Indians in Georgia are 155% less likely than white Georgians to not have a computer at home. This makes it more likely that Georgia's American Indian voters, including members of the LOWER MUSKOGEE CREEK TRIBE, will face significantly higher burdens complying with SB 202's absentee ballot provisions than white voters because they are less likely to have a computer, printer scanner or internet access at home. These resources are needed to obtain and print an absentee ballot application from

the websites of the Secretary of State or county registrar and to print necessary ID documentation for the absentee ballot application and to include when returning a voted absentee ballot to their county registrar's office.

55.   Defendant BRAD RAFFENSPERGER is the Secretary of State of the State of Georgia.  He is responsible for administering and implementing Georgia's election laws and regulations as well as coordinating Georgia's compliance with the National Voter Registration Act of 193 (52 U.S.C. § 20507, *et seq*).  He is sued in his official capacity.

56.   Defendants REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, AND ANH LE are members of the State Election Board and are named herein in their official capacities.

57.   The duties of members of the State Election Board include: promulgating rules and regulations to "obtain uniformity" in the practices and proceedings of elections officials, "as well as the legality and purity in all . . . elections"; formulating, adopting, an orderly conduct of primaries and elections"; promulgating rules and regulations to "define uniform and nondiscriminatory standards concerning what constitutes avote and what will be counted as a vote"; and investigating frauds and irregularities in elections. *See* O.C.G.A. § 21-2-31.

## STATEMENT OF FACTS

### Summary of the Challenged Provisions of SB 202

58.    SB 202 is a 98 page omnibus bill which constitutes a major overhaul of Georgia's Election Code and voting procedures. The bill as enacted includes a new and complicated absentee ballot application and ballot return process and mandates new ID requirements when voting by absentee ballot, as well as when requesting an absentee ballot. SB 202/AP Section 25.

59.    The new absentee ballot ID requirements mandate that voters include a Georgia Driver's license number or Georgia State ID number on their absentee ballot application. If they have neither, voters are required to copy another form of acceptable voter ID and attach the copies of ID documents along with other identifying information to both their absentee ballot applications and inside the absentee ballot envelope when returning the voted ballot – thereby opening up absentee ballot applicants to potential fraud or identity theft.  Because voters, except those over the age of 65 or disabled, must make a new application for an absentee ballot for each election in an election cycle, voters are now required to provide this ID information multiple times each election cycle.

60.    The bill also prohibits public employees and agencies from sending unsolicited absentee ballot applications to voters, yet threatens private individuals

and organizations who are not so prohibited, such as the Plaintiffs, with a

substantial risk of incurring hefty fines for every application they send to an

individual who has not yet registered to vote or who has already requested a ballot

or voted absentee. This will be the case under SB 202 even though many voters

reported not receiving their absentee ballots after making an initial request for one

in the 2020 election cycle and voters benefited from having assistance from

individuals and groups, like the Plaintiffs' organizations, in helping them submit

additional requests so that they could receive their absentee ballots. SB 202/AP,

Section 25.

     61.    SB 202 also significantly limits the accessibility of absentee ballot

drop boxes to voters.  While all counties would be required to have at least one, the

placement of drop boxes is limited to early voting locations and drop boxes are

available only to voters who can enter the early voting location during early voting

hours to deposit their ballot inside the box.  Thus, drop boxes are essentially

useless to voters who can vote early in-person or who cannot access early voting

hours at all due to work or other commitments during early voting hours.

SB202/AP Section 26.

     62.    The bill also mandates an earlier deadline of 11 days before an

election to request an absentee ballot, leaving some voters who become ill or have

to travel out of the area in the lurch if they cannot vote during early voting and are unable to meet the earlier deadline to apply for a ballot.

63.     SB 202 gives unlimited discretion to election boards to limit early voting hours to 9 am to 5 pm weekdays and on weekends, and to two Saturdays before the election.

64.     This change in the law provides county registrars with unfettered discretion to set the time period for early voting between 9 am and 5 pm during weekdays and on weekends, despite the fact that these are the same hours many individuals work, attend school or have other responsibilities that make it impossible or significantly more burdensome for then to cast ballots during regular workday hours. This change will have a disproportionate impact on Black voters and voters of color who have low income and hourly wage jobs and will have difficulty being able to take time off during their workday to vote between 9 am and 5 pm.

65.     Additionally, county boards of election are given unfettered discretion with no guidelines in determining whether to eliminate all Sunday early voting days. SB 202/AP, Section 28.

66.     Georgia Secretary of State statistics demonstrate that Black voters and other voters of color utilize Sunday early voting hours significantly more than

White voters.  Black voters and other voters take part in GOTV efforts focused on Sunday early voting, including "Souls to the Polls" events hosted by Black churches and other faith-based organizations that provide rides to the polls following church services or as part of their church fellowship activities. As a result, the elimination or reduction of Sunday early voting under SB 202 discriminates against Black voters and other voters of color who utilize Sunday early voting hours at higher rates than white voters.

67.   SB 202 also substantially changes the rules on whether voters may cast ballots at the wrong polling location or precinct within the same county where they are registered to vote. SB 202 /AP Section 34.

68.   Under SB 202, voters who arrive to vote after 5 pm and sign an affidavit under penalty of perjury that they cannot get to their home precinct before the close of the polls will be able to cast a provisional ballot which will count with respect to the same contests on the voter's home precinct ballot.  All other voters who arrive at the incorrect precinct before 5 pm can cast a provisional ballot at the incorrect precinct, but none of their votes will count. In order for their votes to count, they will be required to vote at their home precinct, even if they cannot get to their home precinct by the time polls close. The Board of Elections is tasked with reviewing the sworn statements submitted by the voters who cast provisional

out of precinct ballots after 5 pm, but it is unclear what the purpose of that review would be.

69.   SB 202 shortens the runoff period to four weeks following the election that led to the runoff for stateside voters, significantly limiting access to in- person early voting, which may only allow for a three-day early voting period if a runoff occurs during Thanksgiving week. The ability to cast an absentee mail-in voting during this reduced time period will also be challenging, if not impossible for some voters. SB 202/AP Section 28.

70.   The provisions of SB 202 imposing new burdens on voting by absentee ballots and limiting access to early voting will likely result in longer lines and delays at the polls on Election Day, particularly for Black voters and voters of color in Georgia who are more often than white voters impacted by lines and delays when voting on election day. *See, e.g.*, Stephen Fowler, *Why Do Nonwhite Georgia Voters Have To Wait In Line For Hours? Too Few Polling Places,* Georgia Public Broadcasting, October 17, 2020, accessible at: https://www.npr.org/2020/10/17/924527679/why-do-nonwhite-georgia-voters-have-to-wait-in-line-for-hours-too-few-polling-pl

71.   Compounding the burden on Black and Brown voters who experience long lines and delays at the polls, SB 202 also criminalizes "line-warming," the act

of well-meaning individuals and organizations who hand out water or snacks, umbrellas, or chairs to ease the burden on voters standing in line for protracted periods to vote.  SB 202/AP Section 33.

72.    SB 202 also removes powers from the Secretary of State.  The Secretary of State will no longer serve as the Chair of the State Election Board and would no longer have voting powers as a member of the State Election Board. Another provision allows the State Election Board and members of the General Assembly to take over county election offices. SB 202/AP Section 5.

73.    Pursuant to SB 202, the county commission or members of the General Assembly could take action to commence a performance review of election supervisors that could lead to their suspension.  Up to four election supervisors could be suspended at one time. SB 202/AP Section 7.

**Racial and Ethnic Demographics of Voting in Georgia**

74.    The Secretary of State of Georgia maintains detailed records as to the racial demographics of voting. As a result, the Georgia legislators and its elected officials are well aware of the implications of making decisions as to voting on racial and ethnic minorities.

75.    In every presidential election since 2004, the share of registered voters who are white has decreased in Georgia:  from 68% in 2004, to 63% in 2008, to

59% in 2012, to 56% in 2016, to 53% in 2020.  During that same period, the

cumulative share of registered Black, Latinx and Asian American/Pacific Islander

("AAPI") voters and voters who are members of indigenous tribes has increased.

76.    The percentage of the vote that the Republican Presidential candidate

has received in Georgia has decreased in every election since 2004 with the

exception of 2012.

77.    The 2018 statewide election in Georgia demonstrated how fragile the

Republican party's hold on the state was. While Republican candidates won the

races for Governor, Lieutenant Governor, Secretary of State, and Attorney

General, all of the winners received less than 52% of the vote and the Secretary of

State election went to a run-off.

78.    In 2020, a Democratic candidate won the presidential election for the

first time in Georgia since 1992, and two senatorial races were sent to run-offs,

with both Democratic candidates winning in January 2021. This was the first time

a Democrat had won a United States Senate race in Georgia since 1996.

79.    Between 2016 and 2020, the share of registered voters who are white

decreased from 56% to 53% and the percentage of voters who turned out who were

white decreased from 61% to 58%.  These percentages stayed the same for the

January 2021 run-off elections.  These 3 percentage point drops were determinative in who won the 2020 and 2021 elections.

80.    Election analysis demonstrates that Black voters and voters of color usually provide strong support to Democratic candidates. Members of the Georgia General Assembly are aware of this fact.

81.    As seen in the following graphs, even before the pandemic, Black, Latinx, AAPI and American Indian Alaska Native voters (referred to as "AIAN") in Georgia had made increasing use of voting by mail and early voting.  This trend increased significantly during the 2020 and 2021 elections because of the pandemic.











82.    Between 2016 and 2018 general elections in Georgia, the percentage of Black, Latinx, AAPI and indigenous tribe voters choosing to vote by mail increased, while the percentage of White voters choosing to vote by mail or to vote decreased somewhat.  White, Black, Latinx, AAPI, and indigenous voters all chose to vote by mail at larger percentages during the 2020 and 2021 elections because of the pandemic, with a greater percentage of Black and Asian voters choosing to vote by mail than White voters.

83.    Persons of color in Georgia, and particularly Black voters, have chosen to take advantage of early voting opportunities even before the pandemic, at rates comparable to, and often higher than White voters. This is particularly so as to in-person early voting on Sunday where, because of "Souls to the Polls" programs, Black voters, who in the 2020 general election comprised approximately 30% of all registered voters in Georgia, but accounted for 36.5% of Sunday voters, compared to 26.8% of early in-person voters on other days.  In comparison, 60% of voters who voted early on days other than Sunday were white; but whites comprised only 47% of in-person early voters on Sundays, despite comprising 53% of Georgia's registered voters.

84.    Black residents of Georgia are 88% more likely than white Georgia residents to be below poverty level, and, upon information and belief, as a result are less likely to possess the IDs required by SB 202, and more likely to encounter technology access issues that would render the printing and copying requirements of SB 202 more burdensome on them.

85.    Latinx residents of Georgia are 91% more likely than white Georgia residents to be below the poverty level, and, upon information and belief, as a result are less likely to possess the IDs required by SB 202, and more likely to

encounter technology access issues that would make the printing and copying requirements of SB 202 more burdensome.

86.   Black Georgians are 58% more likely than white Georgians to lack computer access in their homes.

87.   Latinx Georgians are 74% more likely than white Georgians to lack computer access in their homes.

88.   Native Hawaiian Pacific Islanders are 100% more likely to lack home computer access than are white Georgians.

89.   Upon information and belief, Black and Latinx voters and other persons of color in Georgia are more likely than white voters in Georgia to hold jobs that do not give them the flexibility to take off from work during the time that early voting and drop boxes are available under the new restrictions of SB 202.

90.   Since 2013, Georgia has experienced polling place closures, consolidations, and changing of locations of polling places, often in communities of persons of color.

91.   Persons of color are more likely than White voters to confront long lines to vote in Georgia when they vote in person.

**Legislative History of SB 202**

92.    SB 202 was part of a wave of proposed legislation introduced in 2021, in a number of jurisdictions, grounded in baseless and often racially tinged claims of voter fraud and election irregularities. Eleven such bills were proposed in Georgia itself.

93.    The procedure leading up to the passage of SB 202 was rushed and irregular. Bills covering the same subjects, but with slightly conflicting provisions were introduced in both houses of the Georgia legislature, sometimes in the same house. Committee hearings were scheduled on the bills, but without posted agendas, and without ample notice to the public or opportunity for the public to view the proceedings without attending them in person.

94.    Throughout the hearings held on these bills, the legislators were repeatedly warned by community members and organizations that these bills, including SB 202 and predecessor bills with similar provisions, would adversely and disproportionately impact populations of persons of color.

95.    For example, at a February 19, 2021 hearing on a related bill that contained many of the same provisions that ultimately were incorporated in SB 202, representatives of the Georgia Coalition for the People's Agenda noted that

"prohibiting of early voting on Sundays, and therefore the elimination of the Souls to Polls, feels like a direct attack on certain communities."

96.     At this same hearing, representatives from the Southern Poverty Law Center Action Fund warned legislators that these bills represented calculated attempts to adversely impact minority groups, and that the provisions such as the photo ID requirement for absentee ballots would disproportionately impact racial minorities.

97.     There was a brief hearing on SB 202 during the first week of March before the Senate Ethics Committee. At this time, SB 202 was a scant two-pages long, and limited to the issue of distribution of absentee ballot applications. At that hearing, representatives of community groups alerted the Committee to the potential negative impact of the civil penalties for distributing absentee ballot applications to certain voters would have on such community groups.

98.     On March 17, 2021, at a hearing of the House Special Committee on Election Integrity, SB 202 was discussed, despite no agenda for the hearing being provided to the public until two hours before the hearing.

99.     At this March 17, 2021 hearing, community organizations and civil rights organizations, including from the Georgia Coalition for the People's Agenda, expressed multiple concerns to lawmakers about SB 202, including the

lack of transparency and irregular process, as well as concerns about the bill taking local authority away from county election officials.

100.  On March 18, 2021 – the very next day – SB 202 was amended again, with a new substitute replacing it. Chairman Barry Fleming conducted a hearing of the House Special Committee on Election Integrity, despite not having a substitute ready to distribute, and instead described the changes to the bill without releasing new language to the public. Despite the fact that there were changes from the prior day, Chairman Fleming also prohibited comment from organizations that had provided comments on March 17, 2021.

101.  On March 19, 2021, two further substitutions to the bill were made and released to the public.

102.  On March 22, 2021, an hour before a scheduled hearing of the House Special Committee on Election Integrity on March 22, 2021, House leadership shared the new over 90-page version of SB 202 with Democratic members of the Committee.  Chairman Fleming refused to take additional comment on the bill, despite the substantial changes and the two additional March 19 substitutions.

103.  When SB 202 was first passed over from the Senate to the House on March 9, 2021, it was a 2-page bill that dealt only with restrictions concerning individuals and third-party groups sending absentee ballot applications to

prospective voters. In a matter of two weeks, the bill had grown to over 90 pages dealing with numerous topics.

104.  During the debate on the House and Senate floor on SB 202, Black legislators alerted their colleagues to the discriminatory impact SB 202 would have on Black voters and other voters of color.

105.  The bill was put up for a full vote two days later on March 25, 2021.

106.  Despite the requirements of Georgia law that bills having either a significant impact on expenditures of a state agency or at least $5 million cost to local agencies must have a fiscal note attached, SB 202 contains no fiscal note. The failure to attach a fiscal note to the bill was raised on the Senate floor, but was summarily rejected by the President of the Senate.

107.  Throughout the debate on SB 202, its supporters attempted to justify the bill using language similar to that used by former President Trump and his allies concerning non-existent election irregularities in the 2020 Georgia Presidential vote. Representative Barry Fleming, Chair of the House Special Committee on Election Integrity, publicly likened absentee ballots to the "shady part of town down near the docks" where the "chance of being shanghaied" is significant.

## CLAIMS FOR RELIEF

## COUNT I

### 52 U.S.C. § 10301 and 42 U.S.C. § 1983
### (Discriminatory Purpose in Violation of the
### Fourteenth and Fifteenth Amendments to the United States Constitution and
### Section 2 of the Voting Rights Act, Against all Defendants)

108.  Plaintiffs repeat and re-allege each and every allegation contained in

Paragraphs 1 to 107 above, as if fully set forth herein.

109.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right

secured by the Constitution or the laws of the United States caused by a person

acting under the color of state law.

110.  Section 1 of the Fourteenth Amendment to the United States

Constitution provides that:

> No state shall make or enforce any law which shall abridge the
> privileges or immunities of citizens of the United States; nor shall any
> state deprive any person of life, liberty, or property, without due
> process of law; nor deny to any person within its jurisdiction the equal
> protection of the laws.

111.  Section 1 of the Fifteenth Amendment to the United States

Constitution provides that:

> The right of citizens of the United States to vote shall not be  denied
> or abridged by the United States or by any State on account of race,
> color, or previous condition of servitude.

112. Both the Fourteenth and Fifteenth Amendment prohibit intentional racial discrimination by state actors.

113. Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, in relevant part, provides:

(a)   No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on account of race or color, or [membership in a language minority group].

(b)   A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

114. A violation of Section 2 of the Voting Rights Act may be based either on a finding of a discriminatory purpose behind the challenged governmental

action or a finding of a discriminatory result from the challenged governmental action

115.  Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

116.  The burdens of SB 202 are intended to, and will have, the effect of disproportionately and adversely affecting the right to vote of Black voters and other voters of color, including, but not limited to,

1) Imposing onerous and unnecessary ID requirements on voters who submit applications for absentee ballots and when they return voted absentee ballots;

2) Prohibiting public employees and public entities from sending out unsolicited absentee ballot applications to voters;

3) Threatening private individuals and non-public entities with potentially large fines for sending absentee ballot applications to voters who are not currently registered to vote or who have already requested a ballot, received a ballot or voted a ballot;

4) Giving county registrars unfettered discretion to limit early voting hours to 9 am to 5 pm and to entirely eliminate Sunday early voting

which will weigh more heavily on Black voters and other voters of color who must work 9-5 pm jobs and participate in "GOTV events, such as, "Souls to the Poll" events organized to increase Black voter turnout.

5)   Limiting access to absentee ballot drop boxes to locations inside early voting sites when advance in person voting is taking place, rending the drop boxes virtually useless since voters can vote early in person at these locations;

6)   Prohibiting out of precinct voting before 5 pm without recognizing the confusion and negative impact experienced by Black voters and other voters of color from hundreds of polling place changes in Georgia since the Supreme Court's decision in *Shelby County v. Holder*;

7)   Criminalizing "line-warming," which provides relief for voters forced to wait in long lines because of the other discriminatory voting changes imposed by SB 202;

8)   Removing the voting power of the Secretary of State on the State Elections Board, coupled with granting power to the State Election Board to take over county election boards and targeting jurisdictions with large populations of Black voters and other voters of color;

43

9)      Encouraging the submission of large numbers of voter challenges by

using the term, "unlimited," in referring to elector challenges in

SB 202.

117.  Race was a motivating factor behind the enactment of SB 202.

118.  SB 202 was enacted at a time when Black voters and other voters of

color were making increasing use of means of voting that are being limited and

restricted in SB 2020.

119.  SB 202 was enacted immediately following elections in which the size

of the population of Black voters and other voters of color, particularly when

compared to the diminishing share of the white vote, had become larger in

statewide elections.

120.  In passing SB 202, the Georgia legislature deviated from procedural

norms in its rushing the bill to passage, in its failure to provide adequate notice and

opportunity to be heard and to view committee proceedings; in its speedy

replacement of a 2-page bill with a 95-page bill without sufficient notice; and in its

failure to include the required fiscal statement.

121.  The purported justification for SB 202 was pretextual.

122.  The Chair of the House Committee on Public Integrity made

culturally-insensitive statements in connection with the passage of SB 202.

123.  The supporters of SB 202 were on notice of the foreseeability of the disparate impact of SB 202.

124.  There are less discriminatory alternatives to every aspect of SB 202, including simply maintaining the status quo, particularly given the complete lack of evidence of significant voter fraud.

125.  Defendants will be unable to prove that, SB 202 would have been enacted without race as a motivating factor.

126.  SB 202 was enacted with a racially discriminatory purpose in violation of Section 2 of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments.

127.  Implementation of SB 202 will irreparably harm Plaintiffs as well as Black voters and other voters of color by denying or abridging their right to vote.

128.  WHEREFORE, Plaintiffs pray for relief as set forth hereafter.

## COUNT II

### (Violation of Section 2 of the Voting Rights Act of 1965
### 52 U.S.C. § 10301)

129.  Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 128 above, as if fully set forth herein.

130.  In determining whether a challenged voting practice violates the results prong of Section 2 of the Voting Rights Act, a court undertakes a two-step

analysis. First, it must determine whether a provision produced a disproportionate impact on account of race.

131.  If there is a disproportionate impact, a court must examine the "totality of the circumstances" and determine whether "the political processes … are [] equally open to participation by [members of a protected class] … in that its members have less opportunity than other members of the electorate to participate in the political process." *See e.g., Johnson v. Governor of Fla.*, 405 F.3d 1214, 1228 n.26 (11th Cir. 2005); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1197-98 (11th Cir. 1999).

132.  The provision of SB 202 that limits early voting, and specifically, limits early voting on Sundays, will have a disproportionate impact on the ability of Black voters in Georgia to participate equally in the political process because Black voters have traditionally voted early on Sundays disproportionately to their share of the Georgia registered voting population.

133.  The provision of SB 202 that prohibits "line-warming" will have a disproportionate impact on the ability of Black voters and other voters of color in Georgia to participate equally in the political process because they are more likely than White voters to confront long lines and wait times when they vote in person.

134.  The disproportionate impact of these provisions, individually and collectively, is caused by present and past discrimination on account of race and ethnicity by the state of Georgia, as shown by the totality of the circumstances, including factors deemed relevant by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 36 (1986).

135.  Georgia has a long history of official discrimination in the jurisdiction that touched the right of minorities to register, vote, or otherwise participate in the electoral process, and the history of voting discrimination against Black residents in Georgia is well documented.  Georgia's history of racial discrimination in voting is so long and deep that courts have taken judicial notice of it.  *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995); *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F.Supp. 3d 1297, 1310 (M.D. Ga. 2018), *aff'd,* 979 F.3d 1282 (11th Cir. 2020).

136.  Voters of color in Georgia bear the effects of discrimination in education, employment, and health that hinder their ability to participate effectively in the political process.

137.  The policy behind the use of the voting practices in question is tenuous and pretextual.

138.  As a result of SB 202's requirements and prohibitions described above, individually and collectively, under the totality of the circumstances, the political process in Georgia is not equally open to participation to Black voters and other voters of color in that such citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

139.  The requirements and prohibitions of SB 202 described above constitute qualifications or prerequisites to voting within the meaning of Section 2 of the Voting Rights Act, and result in the denial or abridgement of the right to vote of U.S. citizens who are residents of Georgia on account of their race or color, or membership in a language minority group, in violation of Section 2 of the Voting Rights Act.

140.  Implementation of SB 202 will irreparably harm Black voters and other voters of color.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT III

### 42 U.S.C. § 1983
### (Burden On The Fundamental Right To Vote
### First And Fourteenth Amendments)

141.  Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 140 above, as if fully set forth herein.

142.  The First and Fourteenth Amendments of the United States Constitution protect the right to vote as a fundamental right. The First Amendment's guarantees of freedom of speech and association protect the right to vote and to participate in the political process.

143.  The right to vote is a fundamental constitutional right also protected by both the due process and equal protection clauses of the Fourteenth Amendment. *See*, *e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983).

144.  "A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration 'the extent to which those interests make it

necessary to burden the plaintiffs' rights.'" See *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

145.  Even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). The more a challenged law burdens the right to vote, the closer the scrutiny courts will apply when examining that law. *Stein v. Ala. Sec. of State*, 774 F.3d 689, 694 (11th Cir. 2014).

146.  SB 202's provisions inflict substantial burdens on Georgia's voters, both through the individual restrictions and provisions and collectively through the combined effect of all of the restrictions and barriers.

147.  SB 202's provisions requiring ID information and photo identification with absentee ballot applications and ballots imposes a substantial burden on all voters. This burden is unnecessary and is not outweighed by any purported State interest.

148.  SB 202's restrictions on sending of absentee ballot applications, both by the Secretary of State and third parties, imposes a substantial burden on voters trying to apply for and vote absentee that is not outweighed by any purported state interest.

149.  SB 202's significant limitations on early voting, in particular the impact on Sunday early voting, impose a substantial burden on all voters; this burden is unnecessary and is not outweighed by any purported State interest.

150.  SB 202's restrictions on drop boxes will make it harder for Georgia voters, particularly those who do not have the schedule flexibility or ability to take time off of work, to vote also impose an unnecessary burden that is not outweighed by any purported State interest.

151.  SB 202's restrictions on out-of-precinct voting, by setting arbitrary times for when out-of-precinct voting is permitted (though still restricted) and otherwise restricting by arbitrary times, impose an unnecessary burden that is not outweighed by any purported State interest.

152.  SB 202 also prohibits providing food and water to voters waiting in line at the polls, i.e., "line-warming," which serves no legitimate purpose other than to create unnecessary burdens on those trying to vote in person.

153.  The burdens caused by these provisions, individually and collectively, are serious and substantial, and in some cases cause voters to risk being completely disenfranchised.

154.  No legitimate state interest justifies these significant restrictions and burdens.

155.  The purported goals of increasing confidence in elections or encouraging uniformity are pretextual at best, and in fact would be harmed by imposing the restrictions and requirements of SB 202.

156.  These restrictions could undermine, not restore, confidence in Georgia's elections, and would do so at the expense of imposing undue burdens on voters.

157.  The requirements and prohibitions in SB 202, individually and collectively, impose a substantial burden on the fundamental right to vote of Georgia citizens, and are neither justified by, nor necessary to promote, interests put forward by the State that were not already being adequately protected by pre-existing criminal laws and election procedures.

158.  These provisions will irreparably harm Black voters and other voters of color.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.


## COUNT IV

**42 U.S.C. § 1983**
**(Freedom of Speech and Association)**
**First And Fourteenth Amendments)**

159.  Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 158 above, as if fully set forth herein.

160.  The First Amendment to the Constitution, as applied by the Fourteenth Amendment, prohibits abridgement of freedom of speech.

161.  SB 202, restricts Plaintiffs and their members core political speech and expressive conduct – namely encouraging voting through the distribution of absentee ballots applications in an effort to engage the public and voters and encourage them to vote.

162.  By penalizing innocent errors in the distribution of absentee ballot applications, SB 202 will have a chilling effect on Plaintiffs' and their members' core political speech, without being narrowly tailored to meet a compelling state interest.

163.  As a result of SB 202, Plaintiff organizations will not be able to carry out a key aspect of their organizational mission.

164.  Because the restrictions in SB 202 and the potential penalties extend to Plaintiff organizations' members, their members' right of association is also jeopardized.

WHEREFORE, Plaintiffs pray for relief as set forth herein.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.      Declare that the challenged provisions in SB 202 violates the Fourteenth and Fifteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act's prohibitions on discriminatory purpose;

2.      Declare that the challenged provisions in SB 202 violate the results prong of Section 2 of the Voting Rights Act;

3.      Declare that the challenged provisions of SB 202 violate the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to vote;

4.      Declare that the challenged provisions of SB 202 violate the First and Fourteenth Amendments to the U.S. Constitution as undue burdens on the right to free speech and freedom of association;

5.      Enjoin Defendants, their agents, officers, employees, successors, and all persons acting in concert with them from enforcing any of the challenged provisions of SB 202;

6.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10301 and other applicable laws; and

7.      Order any other relief that this Court deems just and proper.

Dated: March 28, 2021

/s/ Bryan L. Sells
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

Jon Greenbaum*
Ezra D. Rosenberg*
Julie M. Houk*
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under
Law 1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes*
Gregory Farrell*
Hughes Hubbard & Reed LLP One Battery
Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Applications for admission pro hac vice to
 be filed

Counsel for Plaintiffs

**CERTIFICATE OF COMPLIANCE AND OF SERVICE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing

COMPLAINT FOR NJUNCTIVE AND DECLARATORY RELIEF has been

prepared in Times New Roman 14, a font and type selection approved by the Court

in L.R. 5.1(C), and that I provided notice and a copy of the foregoing using the

CM/ECF system which will automatically send e-mail notification of such filing to

all attorneys of record.

Respectfully submitted this 28th day of March, 2021.

*/s/ Bryan L. Sells*
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC.
P.O. Box 5493
Atlanta, GA 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

*Counsel for Plaintiffs*